No. 33 November 28, 2023 573

# IN THE SUPREME COURT OF THE STATE OF OREGON

In the Matter of the Parentage of S.D.S.,
a Minor Child.

Cory Noel SAUSE,
*Petitioner on Review,*
*and*

Jordan Director SCHNITZER,
*Respondent on Review.*

In the Matter of the Parentage of S.D.S.,
a Minor Child.

Jordan Director SCHNITZER,
*Respondent on Review,*
*and*

Cassondra Lynn GIBEAUT
and Charles Burett Gibeaut,
*Petitioners below,*
*and*

Cory Noel SAUSE,
*Petitioner on Review,*
*and*

Dale C. SAUSE
and Heidi N. Sause
*Respondents below.*

(CC 16DR18690; 16DR19349) (CA A167020) (SC S068780)

On review from the Court of Appeals.*

Argued and submitted May 3, 2022.

C. Robert Steringer, Harrang Long Gary Rudnick P.C., Portland, argued the cause and filed the briefs for petitioner on review. Also on the briefs were James E. Mountain and Erica R. Tatoian, Harrang Long Gary Rudnick, and Thomas McDermott and Jay Beattie, Lindsay Hart, LLP, Portland.

_____

* On appeal from the Multnomah County Circuit Court, Amy Holmes Hehn, Judge. 312 Or App 71, 493 P3d 1071 (2021).

James N. Westwood, Stoel Rives LLP, Portland, argued the cause and filed the brief for respondent on review. Also on the brief was Crystal S. Chase, Stoel Rives LLP.

Robin E. Pope, Portland, filed the brief for *amici curiae* Academy of Adoption and Assisted Reproduction Attorneys, RESOLVE: The National Infertility Association, and The American Society for Reproductive Medicine.

Before Flynn, Chief Justice, and Duncan, Garrett, Bushong, and James, Justices, and Linder and Balmer, Senior Judges, Justices pro tempore.**

BALMER, S.J.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

Bushong, J., dissented and filed an opinion, in which Flynn, C.J., and Linder, S.J., joined. Linder, S.J., dissented and filed an opinion, in which Bushong, J., joined.

_____

** Walters, J., retired December 31, 2022, and did not participate in the decision of this case. Nelson, J., resigned February 25, 2023, and did not participate in the decision of this case. DeHoog and Masih, JJ., did not participate in the consideration or decision of this case.

**BALMER, S.J.**

This case concerns the parentage of a child conceived through assisted reproductive technology (ART). Schnitzer, one party in this case, wanted to have a son. Because he was single, he planned to use his own sperm, an egg donor, and a gestational carrier. Sause, the other party, contributed her eggs to Schnitzer's effort. Through the ART process, their gametes were combined, and a gestational carrier gave birth to a boy, S. Afterward, the gestational carrier, her spouse, and Schnitzer agreed that Schnitzer—and not the gestational carrier or her spouse—was S's intended parent, and a declaratory judgment was entered to that effect. Schnitzer and Sause, however, disagreed about whether Sause was also S's parent and about whether Schnitzer could prevent Sause from having a relationship with S. This case presents the questions of whether Sause is S's legal parent as well as what rights she may have with respect to S, parental or otherwise. The trial court concluded that Sause was S's legal parent based on her undisputed genetic connection to S; a divided Court of Appeals reversed. *Sause and Schnitzer*, 312 Or App 71, 104, 493 P3d 1071 (2021).

For the reasons explained below, we disagree with the trial court and conclude that, in the circumstances of this case, Sause's genetic connection to S does not establish her legal parentage of S. We also conclude, however, that Sause may have contracted with Schnitzer for certain nonparental rights with respect to S. The extent of those rights is an issue that the trial court did not reach due to its conclusion that Sause was a parent. We therefore reverse the judgment of the trial court and remand for further proceedings in that court to declare the legal parentage of S and to determine the extent of Sause's nonparental rights with respect to S.

## I.   BACKGROUND

The trial court's express findings of fact are undisputed on appeal. We present those facts, supplemented by the record and procedural history of this case.

A.  *Historical Facts*

Schnitzer, a divorced father of two daughters, wanted a son, and he turned to ART to achieve that goal. ART comprises a wide range of fertility treatments, including gamete donation, *in vitro* fertilization, and gestational surrogacy. *See* ORS 109.239(1). ART treatments are relatively common: In Oregon in 2020, 804 infants (1.9 percent of those born that year) had been conceived using ART. Sunderam *et al*, *State-Specific Assisted Reproductive Technology Surveillance, United States: 2020 Data Brief* 9, 13 (Centers for Disease Control and Prevention, U.S. Dept. of Health and Human Services, ed., 2022). ART is often used by families experiencing infertility, people with inheritable genetic diseases, single parents, and members of the LGBTQ community, among others. *See* Myrisha S. Lewis, *Normalizing Reproductive Genetic Innovation*, 74 Admin L Rev 481, 488-94 (2022); Anne-Kristin Kuhnt & Jasmin Passet-Wittig, *Families Formed Through Assisted Reproductive Technology: Causes, Experiences, and Consequences in an International Context*, 14 Reprod BioMed & Soc'y Online 289, 289 (2022). Reproduction through ART often involves many parties, potentially including sperm or egg donors, a gestational/traditional surrogate and their spouse, the child or children, and the "commissioning" or "intended" parent or parents, along with various institutions and medical professionals. *See* Ayesha Rasheed, *Confronting Problematic Legal Fictions in Gestational Surrogacy*, 24 J Health Care L & Pol'y 179, 183-84 (2021).

Schnitzer first tried to use ART in 2013 and 2014, using an anonymous egg donor, his own sperm, and a gestational carrier, but those efforts were unsuccessful. In January 2014, Schnitzer met Sause, and they developed an intimate relationship. Schnitzer continued trying to have a son through ART, again using an anonymous egg donor and his own sperm. During the same period, Sause decided to have her own eggs retrieved and stored for fertility preservation purposes unrelated to Schnitzer's goals. Sause began working with Oregon Health & Science University's (OHSU) fertility clinic—the same clinic that Schnitzer was using—to have her eggs preserved for her own future use.

In February 2014, Schnitzer told Sause about his attempts to produce a son. In April 2014, after another unsuccessful ART attempt by Schnitzer using an anonymous egg donor, Schnitzer and Sause discussed the possibility of Schnitzer using Sause's eggs rather than those of an anonymous donor. Schnitzer said that he would only consider accepting Sause's eggs if she signed the same forms that were routinely used for anonymous gamete donors by OHSU, despite Sause clearly not being an anonymous donor. Nevertheless, Sause signed the forms. Schnitzer had gone through a prior dissolution proceeding that had been "high conflict" and "unpleasant" for him, and given the difficulties that he had had in that case, it was important to Schnitzer to have sole legal custody of any child produced through ART. Schnitzer only wanted a son, so they agreed that, if they combined their gametes, Schnitzer would be entitled to any male embryos, while Sause would keep any female embryos.

Sause testified that, at the time of those discussions, she "couldn't wrap [her] head around" why Schnitzer should be "forced to pick an anonymous donor, when a child could know a mother." "I've got eggs. Why not?" she thought. Sause testified that their conversations contemplated that Schnitzer would have sole custody and control over the son, but that Sause would "be known as a mother" and "could be actively involved" in his life:

> "[We] sort of discussed in concept, and I was OK with, the notion of, he made it very clear, he wanted to be raising the child, he wanted sole physical custody, the boy would live with him, and he would pick religions, or have an influence over playing the saxophone or whatever, but I would always be known, it was sort of in our minds a win-win, because I was able to be known as a mother. I could be actively involved."

In Sause's understanding, she would be a parent, but the panoply of her parental rights would be limited. Consistent with those expectations, Sause texted her sister around that time that she "[t]old [Schnitzer] I would sign open adoption type documents as long as my name[']s on [the] birth cert[ificate] and my identity isn't kept from the child * * * and

I'm/my family has access to the kid."[1] Sause began making plans for a nursery in her home, the trial court found, "in anticipation of playing a visiting parent role."

Sause had her eggs retrieved in May 2014. She spoke with her OHSU physician about her plan to have her eggs joined with Schnitzer's sperm to conceive a child. As part of that plan, the trial court found, Sause intended Schnitzer to "have legal custody of any male embryos and offspring produced from the ART process they engaged in together." The court further found, however, that Sause did not intend "to waive all legal rights to male offspring [or] to grant Schnitzer the power to completely exclude her and her family from any role in the child's life."

Before the parties' gametes were combined, Schnitzer asked his business attorney, Nudelman, to draft an agreement reflecting the understanding between Schnitzer and Sause (the "Nudelman agreement"). The Nudelman agreement was discussed, altered at the request of Sause, and signed. The Nudelman agreement reads, in part:

> "1. <u>Designation of Embryos</u>. Notwithstanding anything to the contrary in the [Directed Sperm Donor Consent Form signed by Schnitzer] or [the Informed Consent for Egg (Oocyte) Donation signed by Sause], Schnitzer hereby relinquishes any claim to or jurisdiction over any female embryos from Sause and any resulting female offspring that might result from the use of Sause's eggs. Sause confirms and acknowledges that Schnitzer has full jurisdiction custodial rights over the future disposition of male embryos created from her eggs and she renounces any rights and responsibilities of custody of any male embryo. ***

> "2. <u>Notice of birth/Post-birth contact and communication with child</u>. In the event of a birth of a male child from one of Sause's eggs that has been fertilized by Schnitzer's sperm, Schnitzer shall give Sause notice within five (5) days of the date of the birth. *** The parties agree that upon mutual written agreement of the parties, and upon receipt

---

[1] It is unclear what type of documents Sause anticipated signing, as adoptions in Oregon require amending and replacing the birth certificate to reflect the adoptive family, and the original birth certificate is sealed. ORS 432.223; ORS 432.245. In other words, Sause could not be listed on the birth certificate if S was adopted by someone else.

of advice, counsel and approval of third-party independent medical and psychological consultants, any offspring produced from an embryo may be introduced to Schnitzer or Sause, as the case may be. Thereafter, the parties agree that if it is determined to be in the best interests of the child, Schnitzer and/or Sause (and their respective families), as the case may be, may have in [*sic*] active role in the life of the child."

In other words, Sause agreed to relinquish any rights over any male *embryos* and future disposition of those embryos created from her eggs with Schnitzer. Notably, although the text of the agreement provides that Schnitzer released any "claim" to female *offspring*, Sause's relinquishment regarding male embryos does not use the term "claim"—merely referring to "custodial rights" over the embryos—and does not refer to *offspring* at all. The parties have disputed the significance of that difference: Sause claims that that omission was an intentional reflection of their agreement that she could play a mothering role as to male offspring; Schnitzer claims that the omission was accidental. In either case, as Schnitzer emphasizes, Sause agreed that her ability to be introduced to any male offspring (and Schnitzer's ability to be introduced to any female offspring) was conditioned on the "mutual written agreement of the parties" and advice from third-party "medical and psychological consultants."

In addition to the Nudelman agreement, Sause also executed a standard "Informed Consent for Egg (Oocyte) Donation" form used by OHSU, which reads, in part:

"I understand that I do forever hereafter relinquish any claim to or jurisdiction over the embryos and offspring that might result from the use of my eggs for In Vitro Fertilization. I acknowledge that the recipients have full custodial rights over the future disposition of embryos created from my eggs and that these rights include their use for reproductive purposes of the recipient, donation of unused embryos for research (which might include stem cell research), disposal of unused embryos, or donation of unused embryos to another infertile couple."

That form became an attached exhibit to the Nudelman agreement.

After Sause signed the Nudelman agreement and informed consent form, Sause met with a social worker to discuss the process of being an egg donor for Schnitzer. Sause testified about that discussion, and the trial court found that Sause "was very willing to gift her eggs and any male embryos into Schnitzer's sole legal control, and that she was completely agreeable to Schnitzer having full legal custody of male offspring," but that "she never assumed that she would have no role whatsoever in the male offspring's life, [or] that she would not be known as the boy's mother[.]"

In June 2014, three viable male embryos were created from Schnitzer's sperm and Sause's eggs. No female embryos were created. In February 2015, Schnitzer entered into an agreement with a gestational carrier and her husband. The gestational carrier and her husband agreed to relinquish custody over and parental rights to any child created from Schnitzer's embryos. Sause was not invited to become a party to that agreement, nor is it entirely clear whether Sause knew of the agreement at the time that it was executed. One of the embryos was transferred to the gestational carrier, who became pregnant.

During the pregnancy, Schnitzer and Sause's relationship began to cool, at least on Sause's side. Sause became more certain that "they were not destined to continue in a long-term romantic relationship." Schnitzer, however, remained enamored with Sause and hoped they would marry and raise the expected child together. They continued to communicate about Sause's role in the expected child's life. Schnitzer referred to the fetus as "our baby" in text messages to Sause. He sent text messages to Sause's mother such as an ultrasound image of the fetus with the words, "Your grandson!" Sause's mother testified that Schnitzer also attempted to enlist Sause's parents' help in convincing Sause to marry him and coparent the child.

The gestational carrier gave birth to S on December 22, 2015. Sause and her parents visited the birthing room, and each of them held S. Schnitzer decided to leave S in the gestational carrier's care for a short time after S's birth. Among the reasons for that decision was that Schnitzer had

not yet told his daughters that he was having another child through ART.

When Sause learned that Schnitzer planned to leave S with the gestational carrier for a time, Sause mistakenly interpreted that conduct as Schnitzer stepping away from or abandoning S. Sause sent a series of hostile text messages to Schnitzer that he found highly offensive, including, "You can't have a baby then pawn him off on the surrogate b/c you don't want to take care of him," and, "This is a child not a car or a dog that you can take back or hide someplace till you decide you want him. I signed up to give you a child not a random surrogate." She also wrote, "Who has a baby then decides they don't want it? Wtf? He needs his father not some random oven who's not biologically related to him."

The trial court found that, at that point, and after receiving those messages, Schnitzer decided to cut Sause and her family out of S's life. In a call with Sause's parents, Schnitzer stated, "He's not your grandson." Schnitzer stated that he "would decide what their role in [S's] life would be" and that "he might one day introduce them to S as godparents." Schnitzer later stopped communicating with Sause's parents.

B.  *Procedural History*

The day after S was born, Schnitzer petitioned for a general declaratory judgment of parentage in Multnomah County Circuit Court. *Schnitzer v. Gibeaut*, Case No. 15DR19365. The gestational carrier and her husband were named as respondents; Sause was not named in the action. The petition alleged that Schnitzer and the respondents had entered a surrogacy contract, "with Petitioner becoming the sole and exclusive legal parent of the child with all parental rights and responsibility." The petition also alleged that the embryo used to create S was "created with *** Schnitzer's sperm and donor eggs, which were the exclusive property of Petitioner." That statement was supported by a declaration from an OHSU fertility physician, who stated that "[e]ggs were retrieved from a donor," and the embryos were created "from donor eggs and sperm belonging to *** Schnitzer." The petition further alleged that Schnitzer and the respondents

all desired Schnitzer "to be named as the sole and exclusive legal parent of [S] from the time of the child's birth so the child's birth records will accurately state the child's genetic and intended parentage." Schnitzer requested a declaration that he was "the sole and exclusive legal parent of this child."

A stipulated judgment was signed by the parties and the judge on December 28, 2015, granting the relief requested by Schnitzer. The judgment stated that all parties "believe it is in the best interests of [S] that the child's birth certificate accurately reflects the child's genetic and intended parentage." The judgment named Schnitzer "the sole and exclusive legal parent of [S]." The judgment also named Schnitzer "the sole genetic parent of [S]." The court ordered the state registrar to issue a new or amended birth certificate naming Schnitzer as S's sole and exclusive parent. *See* ORS 432.245.

That case was closed, but, two months later, on March 3, 2016, Sause retained counsel and moved to intervene in the case. Sause alleged that she was the "biological mother" of S and, therefore, an indispensable party to the proceeding. Sause's motion described her expectations pursuant to her agreement with Schnitzer. Specifically, Sause cited the first paragraph of the Nudelman agreement, regarding the division of the embryos. Sause asserted that, in that paragraph, she had waived her rights to any male embryos, but not any male offspring. Sause did not cite the second paragraph, which conditioned her ability to meet that offspring on Schnitzer's consent and third-party advice. Sause alleged that Schnitzer misled the court into concluding that S's mother was anonymous and had no parental interest in the child.

The court denied Sause's motion to intervene by a brief letter opinion on August 5, 2016, specifying that "[t]his ruling is applicable to the requested intervention in [Case No.] 15DR19365 only and is neither determinative nor predictive of other litigation between Mr. Schnitzer and Ms. Sause, if any."

Sause filed this action on September 13, 2016, petitioning the court for a filiation determination or,

alternatively, a declaratory judgment establishing that she is S's parent alongside Schnitzer, and that she has parental rights with respect to S. *Sause v. Schnitzer*, Case No. 16DR18690. Sause alleged that she "is the mother" of S, and "has and continues to agree to assume all rights and obligations with respect to the child." Along with a determination that she is S's mother, Sause requested an order to amend or replace S's birth certificate, and an order providing her with parenting time.

Schnitzer answered that petition and simultaneously filed a petition (together with the gestational surrogate and her husband) for another declaratory judgment establishing Schnitzer as S's sole legal parent. *Schnitzer v. Sause*, Case No. 16DR19349. That petition did not dispute that, as a factual matter, Sause was genetically related to S, because he was conceived using her egg. As a legal matter, however, Schnitzer asserted that, "[u]nder Oregon law, [the gestational surrogate] was presumed to be the child's legal mother at birth, and [her husband] was presumed to be the legal father, absent a contractual agreement to the contrary." Schnitzer's petition contended that Sause had never had parental rights as to S and, alternatively, that even if Sause did have parental rights at one time, she had knowingly waived them. The petition sought a declaration that Sause was an egg donor with no parental rights or responsibilities, that she was not entitled to parenting time, and that her parents also had no legal relationship to S. Sause's case and the case brought by Schnitzer, the surrogate, and her husband were consolidated.

The consolidated case proceeded for the next year, leading to a nine-day bench trial in September and October 2017. As it was litigated in the trial court, the case was one of dueling declaratory judgments, with each party taking on the burden of proof and persuasion at differing points. As a result, several theories were advanced by the parties in support of their respective petitions, and those theories, the responses, and the counterarguments, blurred at times. At different points, the basic dispute over Sause's legal rights with respect to S was grounded in statutes; the contractual arrangements between Sause, Schnitzer, OHSU, and the

surrogate and her husband; Oregon common law; and the federal constitution. Ultimately, the trial court was asked to resolve the question of legal parentage and was given multiple options as to the appropriate source of law on which to ground that decision.

During her opening statement in the trial court, Sause argued, "Initially, as the record will reflect, the mother was determined to be * * * a [gestational] surrogate. Because [the gestational surrogate] was married, * * * her husband * * * was deemed to be the father. And that's what the original birth certificate showed." After that, Sause contended, Schnitzer became S's "sole parent" in the stipulated proceeding with the surrogate by misrepresenting to the court that the egg used to conceive S belonged exclusively to him.

Sause contended that, because Schnitzer was a single parent, there was an "empty space on [S's] birth certificate" and that space should be filled because "[t]his is a motherless child officially as of today." Sause argued that she should be the one to fill that space as S's mother because "her genetic consanguinity is not in dispute" and she "has always been an intended party [*sic*] of this child." Sause did not argue that "biology alone" gave rise to her parental rights, stating that that "has never been Ms. Sause's legal position." Instead, Sause relied on a "biology-plus" framework (drawn from *Lehr v. Robertson*, 463 US 248, 261-62, 103 S Ct 2985, 77 L Ed 2d 614 (1983), discussed further below) to assert that she was a parent based on her biological connection plus the fact that she had "grasped her opportunity to parent her child in an effort to develop a relationship."

Schnitzer agreed with part of Sause's opening statement, namely, that the birthing person presumptively had parental rights under Oregon law and that a genetic connection alone did not create such rights, stating, "I think the parties agree that biological connection alone does not give rise to parental rights, unless of course you're the birth mother. If you're the birth mother, you are presumed to have * * * these types of rights. But in this case, Ms. Sause is not the person who gave birth." Schnitzer did not dispute

Sause's "biological connection" to S, but he argued that that connection did not "establish[] parental rights *ab initio*."

Schnitzer contended that one way to establish those parental rights was through contract, as his rights had been established through his agreement with the surrogate:

> "[T]hat is why [the gestational surrogate's] contract to be a gestational carrier is signed by the \*\*\* intended parents. Intended parents who go through an [in vitro fertilization] [(IVF)] [*sic*] and the gestational carrier process all make clear in the cont[r]act with the person giving birth, who is presumed under Oregon law to be the mother, unless there's a cont[r]act that says otherwise, they all say, we are the intended parents, and they do other things to, that establish \*\*\* these rights."

Schnitzer argued that Sause had not established parental rights for herself through contract, nor had she adequately "grasp[ed] the opportunity" to establish a parent-child relationship such that she had rights protected under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

In response, Sause clarified that she was not arguing that her parental rights arose only from contract or agreement with Schnitzer, specifying that the Nudelman agreement "is not the well spring or source of Ms. Sause's parental rights." Instead, her theory of the case was that "her rights arise under the due process laws of the United States Constitution, not under the Nudelman agreement." In Sause's view, under United States Supreme Court precedent, "parental rights arise from a showing of a biological connection, plus something else," namely, "grasping an opportunity to develop a relationship with his or her offspring, and accepting 'some measure of responsibility for the child's future.'" Sause argued that she had grasped "100 percent of the available opportunity to develop a relationship" with S.

Schnitzer's moved, under ORCP 54 B(2), to dismiss Sause's petition on the ground that she had shown no legal right to relief. The court narrowed the legal question to whether—given that Sause's genetic connection to S was undisputed—Sause had "made a *prima facie* case that she

did, in fact, assert her maternity[.] Did she, in fact, attempt to grasp the opportunity to participate in the rearing of the child financially?" Because S was then so young, the trial court focused on the parties' conduct before his birth, namely, whether Sause had demonstrated that she was an "intended parent." The court rejected the legal meaning of that term as a "specific term of art" in "the world of assisted reproductive technology and the legal world," and instead explained that, to Sause, that term meant "that she would have a motherly role of some sort." Sause intended to be a parent in that she expected to be on the birth certificate, to be known as S's mother, and to be involved in his life. In the court's view, Sause's conduct met the constitutional standard of "grasping" that the court was applying. The court therefore concluded that Sause had produced sufficient evidence, and it denied Schnitzer's motion to dismiss. Schnitzer then presented the remainder of his case.

The trial court ruled in favor of Sause, relying on *Lehr* for the proposition that a "person linked to a child only by genetics must take an affirmative step to accept the responsibilities associated with parenthood" to be deemed a parent. (Internal quotation marks omitted.) The court first determined that Sause was S's legal mother "by virtue of being his undisputed female genetic parent." The court then found that both parties had agreed up until S's birth that, although Schnitzer would have full legal and physical custody of S, Sause would play an unspecified "maternal" role in S's life. The trial court noted that Schnitzer had not decided to "cut Sause and her family out of S's life" until Sause sent the hostile text messages on the day of S's birth, and that, as soon as Schnitzer had his "change of heart" following S's birth, Sause diligently pursued legal action to assert her right to a role in S's life. The court also concluded that the Nudelman agreement did not waive Sause's parental rights because, in the court's view, the agreement was not sufficiently "clear, unambiguous, knowing, voluntary and intelligent." The trial court granted Sause's petition for declaratory judgment and declared her to be a parent of S, dismissed Sause's filiation petition, and dismissed Schnitzer's declaratory judgment petition.

Schnitzer appealed, assigning error to the judgment and to the trial court's denial of his ORCP 54 B(2) motion. Schnitzer essentially argued that the trial court had legally erred in (1) treating Sause's genetic parentage as giving rise to a presumption of legal parentage; (2) concluding that Sause had a constitutionally protected parental right; and (3) interpreting and applying the Nudelman agreement in the manner that it did.

The Court of Appeals reversed, in a split decision with three separate opinions. *Sause*, 312 Or App at 104. The lead opinion concluded that Sause's "mere biological connection to S does not confer parental rights on her." *Id.* at 93. It explained that Sause's genetic connection to S presented her an opportunity to develop parental rights, if she "'grasp[ed] that opportunity and accept[ed] some measure of responsibility for the child's future.'" *Id.* at 100 (quoting *Lehr*, 463 US at 261-62 (describing the "biology-plus" standard for creating constitutionally protected parental interests)). The opinion concluded, however, that Sause had not adequately grasped that opportunity because, among other things, she expressly had disavowed any financial or other responsibility for S in the Nudelman agreement, and her decision to retrieve her eggs was motivated by her own medical goals. *Id.* at 102-03.

Judge Mooney concurred. She agreed with the majority (and the dissent) that "genetics alone do not confer parental rights," but, in her view, the case was governed by Senate Bill (SB) 512 (2017), Or Laws 2017, ch 651, §§ 1-4, which had amended and added to Oregon's statutes involving ART, and become effective during the trial court proceedings; under those new and amended statutes, according to Judge Mooney, Sause had no parental rights as to S. *Sause*, 312 Or App at 109-10 (Mooney, J., specially concurring). SB 512 became effective on January 1, 2018, which was after the trial court signed its judgment on December 21, 2017, but before that judgment was entered in the dockets for the two consolidated cases on January 18 and 24, 2018. The concurrence observed that judgments become effective on their date of entry, *see* ORS 18.082(1), and reasoned that SB 512 governed this case. (The lead opinion disagreed that

SB 512 applied, briefly observing that "it was understood that the new law would not apply to the trial court's decision in this case." *Sause*, 312 Or App at 86 n 9.) Under SB 512, Judge Mooney concluded, Sause had "'no right, obligation or interest with respect to'" S. *Id.* at 106 (Mooney, J., concurring) (quoting SB 512, as codified at ORS 109.239(2)(a)). With respect to the federal constitutional issue, the concurring opinion took the position that the *Lehr* biology-plus standard applied to only children conceived through sexual intercourse and did not apply to children conceived through ART.

The dissent agreed with the other two opinions that, for purposes of the federal constitution, "Sause's mere biological connection to S does not confer parental rights." *Id.* at 112 (Kamins, J., dissenting) (internal quotation marks omitted). In the dissent's view, however, the *Lehr* biology-plus standard was determinative in this case, and Sause had adequately grasped the opportunity to develop a relationship with S to meet that standard. *Id.*

Sause sought review, which we allowed.

## II.   ANALYSIS

The primary questions on review are whether Sause is S's legal parent due to her genetic connection with S and, if she is not, whether another source of law may provide her a basis to assert legal rights and responsibilities with respect to S. We begin by determining the applicable law. We then consider whether Sause has parental rights under Oregon law or a federal constitutional right with respect to S under *Lehr* and the Due Process Clause. Finally, we assess the significance of the Nudelman agreement between Schnitzer and Sause, and what contractual rights and responsibilities Sause may have with respect to S pursuant to that agreement.

### A.   *Whether SB 512 (2017) Applies*

We first consider whether SB 512 applies to this dispute and, for the reasons explained below, conclude that it does not. SB 512 applies to "establishments and disestablishments of parentage and parentage proceedings made

or commenced on or after" January 1, 2018. Or Laws 2017, ch 651, § 54. At trial, the parties agreed that, as of the date that the judgment was signed by the trial court, SB 512 had not yet gone into effect and would not apply to this dispute. As noted, the judgment at issue here was signed on December 21, 2017, but it was not entered in the registers for the two consolidated cases until January 18 and 24, 2018.

Schnitzer now contends that the trial court erred by not applying SB 512 when the judgments were entered in 2018, after SB 512 went into effect. Schnitzer concedes that he never asked the trial court to apply SB 512. He argues, however, that preservation of such an error is "automatic" under *McCarthy v. Oregon Freeze Dry, Inc.*, 327 Or 84, 95 n 6, 957 P2d 1200, *adh'd to on recons*, 327 Or 185 (1998). Schnitzer alternatively argues that plain error review is appropriate. We reject both arguments.

First, *McCarthy* is inapposite. In *McCarthy*, the plaintiff raised an unpreserved argument that a Court of Appeals attorney fee order was flawed because it did not include special findings as required by Oregon statute. *Id.* at 95. This court held that the plaintiff was not required to preserve that issue because the issue "arose when the Court of Appeals issued its order," *id.* at 95 n 6, so the plaintiff had no opportunity to address it earlier. Here, by contrast, the issue arose—and was addressed—before the trial court entered its judgment. Schnitzer addressed the issue during the trial in 2017, and he could have argued then that SB 512 would apply if the judgment was entered after January 1, 2018. Schnitzer also could have raised the issue in January 2018 before the judgment was entered. As a result, any error assigned to the trial court's decision not to apply SB 512 is unpreserved.

We also reject Schnitzer's request for plain error review. "When a party has failed to preserve an assignment of error, we consider that error only if it is plain." *State v. Ulery*, 366 Or 500, 503, 464 P3d 1123 (2020) (citing ORAP 5.45(1)). When an error qualifies as plain, "the decision whether to review [it] rests with the discretion of the appellate court." *Id.* "That discretion entails making a prudential

call that takes into account an array of considerations," *State v. Vanornum*, 354 Or 614, 630, 317 P3d 889 (2013), including:

> "the competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether the policies behind the general rule requiring preservation of error have been served in the case in another way, *i.e.*, whether the trial court was, in some manner, presented with both sides of the issue and given an opportunity to correct any error."

*Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382 n 6, 823 P2d 956 (1991). The policies underlying the preservation requirement include fairness to the opposing party, giving the trial court a chance to correct the error and obviate the need for an appeal, and fostering full development of the record. *Peeples v. Lampert*, 345 Or 209, 219-20, 191 P3d 637 (2008).

Assuming without deciding that there was plain error, the above considerations counsel against reaching that error. As to fairness, the application of pre-SB 512 law was mutually agreed upon by both parties and the trial court; the trial court's decision to take that approach was not unfair to either party. The trial court applied the law that both parties expected it to apply. As to obviating the need for appeal, neither party moved for the court to reconsider its judgment after SB 512 went into effect. The trial court was never asked by the parties to correct the alleged error and avoid an appeal on that ground. Overall, the policies underlying preservation and considerations relevant to reaching plain error guide us not to reach the alleged error here, and we decline to do so. As a result, SB 512 does not apply, and this case is governed by the statutes in effect in 2017.

B.  *Parentage Under Oregon Law*

The next question is whether Sause is a legal parent of S because of their undisputed genetic connection. For the reasons explained below, we conclude that Sause's genetic connection to S, by itself, does not make her a legal parent of S.

We begin with a brief history of parentage law in Oregon to provide context for our conclusion. Early parentage law was rooted in the English common law. *See* Michael S. DePrince, Note, *Same-Sex Marriage and Disestablishing Parentage: Reconceptualizing Legal Parenthood Through Surrogacy*, 100 Minn L Rev 797, 802-04 (2015). At common law, legal parentage depended primarily on a combination of birth and marriage: A child born to a married woman was "legitimate" and had two legal parents (the birth mother and her husband), while a child born to an unmarried woman was "illegitimate" and had no legal parents. *See Thom v. Bailey*, 257 Or 572, 580, 481 P2d 355 (1971); *Richter v. Richter*, 117 Or 621, 630, 245 P 321 (1926); *State v. McDonald*, 59 Or 520, 526, 117 P 281 (1911).

Over time, the law's emphasis on marriage shifted. The law imposed upon unmarried mothers the rights and responsibilities with respect to their children, *see Nine v. Starr*, 8 Or 49, 50 (1879) ("[T]he mother is the natural guardian of such a child, and is bound to maintain [the child.]"); adoption became a legal possibility, *see* General Laws of Oregon, Civ Code, ch XII, title IV, § 66, p 693 (Deady 1845-1864); and, in 1957, the legislature abolished illegitimacy as a legal status; *see* ORS 109.060 (the legal status and relationships, and the rights and obligations between a person and their descendants or parents are the same for all persons, whether or not the parents have been married); *Thom*, 257 Or at 583-84 (explaining statute's effect as to illegitimacy).

At the same time, the marital presumption persisted. *See Thom*, 257 Or at 580-84 (tracing parentage statutes from common law to 1957). In 1957, the legislature enacted ORS 109.070, which created a conclusive presumption that the "child of a wife cohabiting with her husband who is not impotent" was the legal child of the husband and wife. Or Laws 1957, ch 411, § 2(1). A disputable presumption of parentage existed for other children born to a woman who was married at the time she gave birth. *Id.* § 2(2). ORS 109.070 has since been amended numerous times, and it now provides that parentage is "rebuttably presumed" for a person married to the birthing person at the time of the child's birth, ORS 109.070(1)(a), and it also prevents third parties

from challenging that presumption "as long as the spouses are married and are cohabiting, unless both spouses consent to the challenge," ORS 109.070(2).

As the marital presumption has shifted, the reliance on birth as a basis for parentage—at least as a default presumption—has remained the same. ORS 109.065(2), as enacted by SB 512, provides, "A person is the mother of a child to whom the person gives birth." Numerous other statutes reflect an implicit assumption that, absent an adoption, additional proceeding, or other operation of law, the person who gave birth to a child is a legal parent of that child. *See, e.g.*, ORS 109.070(1)(a) (2015), *amended by* Or Laws 2017, ch 651, § 3; ORS 109.041(1); *former* ORS 109.315(1)(g) (2015), *renumbered as* ORS 109.285(1)(g) (2021); ORS 109.092 (2015), *amended by* Or Laws 2017, ch 651, § 18 (all so demonstrating).[2]

The law also has been changed to account for children born to unmarried parents. Broadly speaking, there were two types of scenarios that the law had to address. The first was where an alleged father sought to confirm his biological paternity as a basis for legal parentage. The second was where another party (for example, the mother or the state) sought to confirm an alleged father's biological paternity, often as a basis for seeking child support. In response to those issues, statutes began incorporating blood typing and DNA as tools to determine whether a father was biologically related to a child. (At that time, there was no significant possibility of a birth mother not being genetically related to the child.) As relevant here, in 1953, the legislature authorized courts to use blood types to determine "the possibility of the alleged father's paternity." Or Laws 1953, ch 628, § 4. In 1975, ORS 109.070 was amended to allow unmarried fathers to establish paternity by swearing, together with the birth mother, that they were the "natural" father and that there was no other legal father. Or Laws 1975, ch 640, § 3(5). In 1995, the blood-type statute was amended to include DNA testing as a method of determining paternity. Or Laws 1995, ch 608, § 5. Those tools helped the state to ensure

---

[2] We refer to the 2015 versions of the listed statutes, because those versions reflect the state of the law during the year that S was born.

that children born to unmarried mothers through sexual intercourse could have the benefit of child support from their biological father. Now, ORS 109.258, discussed further below, provides that, in a paternity adjudication, "[a] disputable presumption of paternity is created if one or more blood tests [including DNA tests] result in a cumulative paternity index of 99 or greater."

The law adapted differently to address the parentage of children born through artificial insemination (AI) and, later, ART. As AI entered wider use between the 1950s and 1970s, there were essentially two types of AI recognized at the time: artificial insemination by husband (AIH) and artificial insemination by donor (AID). *See* George P. Smith, II, *Through a Test Tube Darkly: Artificial Insemination and the Law*, 67 Mich L Rev 127, 128 (1968). At that time, the standard practice in AID was for the donor to remain anonymous, and clinics took pains to preserve that anonymity. *See* Naomi Cahn, *The New Kinship*, 100 Geo LJ 367, 374, 391-92 (2012).

The Oregon legislature expressly recognized AI in 1977, restricted its performance to licensed physicians, and clarified the rights and obligations of participants in both AIH and AID. Or Laws 1977, ch 686, §§ 1-7. That legislation established that children conceived through AI and born to a married person had the same "relationship, rights and obligation" to the mother's husband as they would if they had been conceived through sexual intercourse. ORS 109.243 (1977), *amended by* Or Laws 2017, ch 651, § 5. It also provided that any nonhusband donor would "have no right, obligation or interest with respect to a child born as a result of the artificial insemination," and vice versa. ORS 109.239 (1977), *amended by* Or Laws 2017, ch 651, § 4.

The AI statutes were amended by SB 512 in 2017 to address ART, which was defined, in part, as "a method of causing pregnancy other than sexual intercourse." ORS 109.239(1). In similar wording to the prior AI statute, ORS 109.239(2) also provides, "If the donor of gametes used in assisted reproduction is not the mother's spouse: (a) The donor shall have no right, obligation or interest with respect to any child conceived as a result of the assisted

reproduction; and [the child shall have no such right against the donor].” In other words, in cases involving AI and ART, under both the 1977 and 2017 statutes, a nonspouse gamete donor, whether of sperm or eggs, does not have any “right, obligation or interest” with respect to their genetic offspring by virtue of their donation.[3]

With that context, we can now evaluate Sause’s claim to legal parentage of S. As explained above, we apply the statutes in effect before SB 512 was enacted. Sause’s central claim is that the single fact that she is genetically related to S (that is, “biology alone”) means that she is entitled to at least a presumption of parentage, and that she never waived her parental rights.

Sause has not identified any statute or case law that, on its face, provides that a female genetic parent who did not give birth to the child is entitled to a presumption of parentage. Instead, Sause relies on two other statutes: ORS 109.258, quoted above, which creates a disputable presumption of *paternity* based on blood tests; and ORS 107.101(1), which establishes Oregon’s policy to “[a]ssure minor children of frequent and continuing contact with parents who have shown the ability to act in the best interests of the child.”

Starting with ORS 107.101(1), Sause argues that this court should conclude that she is S’s parent in order to ensure that she has “frequent and continuing contact” with

_____

[3] Justice Bushong’s dissent also reviews the development of the common law and early statutes in discussing Oregon’s history, much of which demonstrates the law’s historical misogyny and discrimination against women. 371 Or at __ (Bushong, J., dissenting) (at 3:15 - 4:1). It then focuses on what it calls the “equality principle” reflected in ORS 109.030 (2015), *amended by* Or Laws 2017, ch 651, § 50, which provides that the “rights and responsibilities of the parents, in the absence of misconduct are equal, and the mother is as fully entitled to the custody and control of the children and their earnings as the father.” 371 Or at __ (at 9:3-10). That discussion is not wrong, but it also is not relevant. As explained more extensively below, Schnitzer’s legal argument prevails here not because of the “gender-hierarchical order” of the common law or because of his gender, but because creating a male child through ART, of whom he is now an undisputed parent, was his idea, and he took the contractual and legal steps necessary to accomplish that, while Sause did not. And, contrary to Justice Bushong’s position, ORS 109.030 (2015) plays no role here because, by its terms, it applies to “the rights and responsibilities of the *parents*,” which necessarily means “legal” parents, and thus assumes the proposition which the dissent seeks to establish by citing the statute. (Emphasis added.)

S. But that argument fails because that statute applies only to those who are legal "parents" and thus assumes the conclusion that Sause seeks to reach. If Sause *were* a legal parent of S, then ORS 107.101(1) might guide a court to ensure contact between her and S. But ORS 107.101(1) does not provide an independent basis for *determining* parentage.

Likewise, Sause's point that no one else claims to be S's mother is immaterial. Oregon law does not require that a child have a single mother as opposed to none or two. Although it might be relevant in another case, the lack of another person claiming to be S's mother has no bearing on Sause's claim here.

Sause's argument based on ORS 109.258 has more traction, however. ORS 109.258 provides, in full:

> "A disputable presumption of paternity is created if one or more blood tests result in a cumulative paternity index of 99 or greater. If the court or administrator finds that the conclusions of all the experts, as disclosed by the evidence based upon the tests, are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly. If the experts disagree in their findings or conclusions, the question shall be submitted upon all the evidence."

Sause argues that that statute should apply equally to maternity as it does to paternity. *See* Or Const, Art I, § 20.[4] Sause contends that, under ORS 109.258, her undisputed genetic link to S creates "a disputable presumption of" maternity. She argues that that presumption should lead to a determination of her legal parentage because "[n]o other person seeks to be deemed [S's] mother," and she "is the only candidate for maternal parenthood of [S]."

Schnitzer makes two independent legal arguments in response to Sause's reliance on ORS 109.258. For reasons that we will explain, we agree with both of those arguments. First, Schnitzer contends that ORS 109.258 "applies where evidence points to a particular man as the parent and means of support of a child, but the genetics of it are in

---

[4] Article I, section 20, provides, "No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

question," and does not apply to ART. *See Johnson v. Calvert*, 5 Cal 4th 84, 89-91, 851 P2d 776, 779-81, *cert den*, 510 US 874 (1993) (holding that, under California's corresponding statute, blood tests create evidentiary presumptions that do not apply when the factual basis for parentage is undisputed, in part because the statute was "not motivated by the need to resolve surrogacy disputes"; instead, surrogacy disputes must be resolved through a "purely legal determination as between the two claimants"). There is no dispute over the genetic link between Sause and S, so, Schnitzer reasons, ORS 109.258 does not apply. Schnitzer also argues that ORS 109.258 appropriately applies only to men because that statute "serves the important governmental objective of finding absent fathers" and therefore survives the intermediate scrutiny required for a constitutional distinction based on sex. Sause does not respond to Schnitzer's arguments.

Assuming without deciding that ORS 109.258 applies equally to women as it does to men, we are not persuaded that ORS 109.258 requires a presumption of *legal* parentage in cases involving ART where genetic paternity or maternity is undisputed. Instead, ORS 109.258 was enacted to help resolve evidentiary disputes over the efficacy of blood tests in identifying putative fathers. *See* Or Laws 1999, ch 80, § 27 (adding the 99 percent threshold as part of an act "[r]elating to child support program changes mandated by welfare reform"). ORS 109.258 allows blood tests to create an evidentiary presumption that may or may not lead to a determination of legal parentage. In cases involving children conceived without ART where parentage is disputed, genetic testing may rebuttably demonstrate who participated in that conception and who, as a result, may be a legal parent under other provisions of Oregon and federal law (such as the *Lehr* standard, discussed below). But that evidentiary presumption is unnecessary where genetic parentage is undisputed, as the California Supreme Court held in *Johnson*. There is no indication that the evidentiary presumption in ORS 109.258 was enacted to address ART or the establishment of legal parentage in surrogacy or other ART disputes.

Schnitzer's second argument regarding ORS 109.258 is that that statute does not apply in these circumstances

because of the "donor" statute, ORS 109.239 (1977), under which both Sause and Schnitzer are donors of the gametes from which S was conceived. Again, assuming without deciding that ORS 109.258 applies equally to women as it does to men, the disputable presumption of paternity created by that statute does not yield an establishment of legal parentage in every case, nor does it do so automatically. For a blood test to lead to legal parentage, as ORS 109.258 contemplates, there must be an adjudication or other proceeding. *See* ORS 109.258 (putting the question to "the court or administrator"); *see also* ORS 109.065 (stating that parentage may be established by "an *adjudication* of the person's maternity or paternity" (emphasis added)). In that adjudication, the court can determine whether the putative parent's maternity or paternity is a valid basis for parentage.[5] In some cases, blood tests demonstrating genetic maternity or paternity may be dispositive evidence that a putative parent engaged in the sexual intercourse that created a child. In some circumstances, that evidence could be the basis for a determination that a putative parent is a legal parent. In other cases, a putative parent's claim may be barred by the marital presumption, ORS 109.070(2). Or, as is relevant here, the putative parent's claim of parentage may be foreclosed by the donor statute, ORS 109.239 (1977).

The parties dispute whether ORS 109.239 (1977) applies to Sause and bars her claim of parentage, again assuming that ORS 109.258 grants Sause a presumption of maternity that could be a basis for parentage. That is a question of statutory interpretation, which we analyze using the methodology set out in *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). In doing so, our aim is to discern the intention of the legislature, which we do by giving "primary weight to the text and context of the disputed statutory terms," because "there is no more persuasive evidence

---

[5] Justice Bushong's dissent contends that Schnitzer's argument based on ORS 109.258 fails because "the trial court determined the validity of Sause's parentage claim *in this case*." 371 Or at __ (Bushong, J., dissenting) (emphasis in original) (at 13:15-18). Under our interpretation of that statute as not applying when genetic parentage is undisputed, however, the trial court's reliance on it to conclude that Sause is S's parent was legal error. Additionally, as we next discuss in the text, Sause's claim to legal parentage also is foreclosed by the donor statute, ORS 109.239.

of the intent of the legislature than the words by which the legislature undertook to give expression to its wishes." *Kinzua Resources v. DEQ*, 366 Or 674, 680, 468 P3d 410 (2020) (internal quotation marks omitted). "We also consider legislative history for what it may be worth in a particular case." *City of Portland v. Bartlett*, 369 Or 606, 610, 509 P3d 99 (2022).

We begin with the text of ORS 109.239 (1977), quoted in part above, which provides, in full:

"If the donor of semen used in artificial insemination is not the mother's husband:

"(1) Such donor shall have no right, obligation or interest with respect to a child born as a result of the artificial insemination; and

"(2) A child born as a result of the artificial insemination shall have no right, obligation or interest with respect to such donor."

Assuming that ORS 109.239 (1977) applies equally to egg donors as it does sperm donors,[6] the question is whether Sause is a "donor" within the meaning of that statute, which the parties and *amici* dispute. There is no statutory definition of "donor," but "donor" generally means "one used as a source of biological material," for example, "a *donor* of a tissue for transplantation." *Webster's Third New Int'l Dictionary* 673 (unabridged ed 2002) (emphasis added). The technical meaning of "donor" in the medical profession is largely the same: "An individual from whom blood, tissue, or an organ is taken for transplantation." *Stedman's Medical Dictionary* 536 (27th ed 2000). (The version in use in 1977 was limited to blood donations: "A person from whom the blood is drawn in the performance of blood transfusion." *Stedman's Medical Dictionary* 419 (4th unabridged lawyers' ed 1976).) The text

---

[6] The legislature defined "artificial insemination" to mean "introduction of semen into a woman's vagina, cervical canal or uterus through the use of instruments or other artificial means." ORS 677.355. That definition facially excludes egg donation and other forms of ART. *Amici* argue that that definition should be construed to include egg donors based on Oregon's Equal Rights Amendment, Or Const Art I, § 46, which provides, in part, "Equality of rights under the law shall not be denied or abridged by the State of Oregon *** on account of sex." As with ORS 109.258, we assume for purposes of this analysis that ORS 109.239 (1977) applies to egg donors, but we do not decide that issue in this case.

of ORS 109.239 (1977) offers an additional clue to the meaning of "donor." The text does not specify that donors can be only either "anonymous" or "known." Instead, the first portion of the text distinguishes between two types of donors: donors who are "not the mother's husband" and donors who are. By limiting the statute's applicability to situations where the donor of semen is *not* the husband, that sentence implies that, in some situations, the donor of semen *will* be the mother's husband. That wording, consistent with the above definitions, suggests that the term "donor" encompasses those who contribute sperm to be used in artificial insemination, including both those who intend to be parents of the child (*e.g.*, in cases where the donor is the husband) and those who do not, as well as both those whose identity is known to the recipient and those who are anonymous.

The statutory context offers additional support for a definition of "donor" that includes both Schnitzer and Sause. ORS 109.247 (1977), *amended by* Or Laws 2017, ch 651, § 6, states that the AI statutes, including ORS 109.239 (1977), "apply to all persons conceived as a result of artificial insemination." That wording suggests that the legislature intended those statutes to govern *all* cases of AI and that no cases would be excluded. There is no additional statute that deals expressly with "known donation"—or anonymous donation, for that matter—so we may infer that the legislature intended the AI statutes to apply broadly to all cases of AI.

Thus, the statutory text and context indicate that ORS 109.239 was intended to apply to all those who contributed semen for use in AI if they were "not the mother's husband." The available legislative history confirms that understanding.

The purpose of the 1977 legislation was "to establish the legitimacy and legal rights of children resulting from artificial insemination." Exhibit A, House Committee on Judiciary, HB 3193, May 3, 1977, 1 (testimony of Dr. Miles Novy). The chief drafters and proponents of the bill explained that there are "basically two types of artificial insemination—AIH (Artificial Insemination, Husband) using semen from the woman's husband, and AID (Artificial Insemination, Donor) using semen from a donor who *usually*

remains anonymous." Exhibit D, House Committee on Judiciary, HB 3193, May 3, 1977, 1 (written testimony of Jay Folberg and Betty Bechtel) (emphasis added). They further explained that, when a family turns to AID, "[t]he donor, who is the biological father, is *normally* anonymous and would be an inappropriate person to hold responsible for the support and care of the child." *Id.* at 2 (emphasis added). That introductory testimony indicates that, in general, the legislature likely understood from the drafters that the most common practice would be for donors to remain anonymous, but that there might be exceptions.

One legislator put a finer point on it. In a committee hearing on May 3, 1977, Representative David Frohnmayer stated that he did not "see any provisions with respect to whether or not the donor would be anonymous." Tape Recording, House Committee on Judiciary, HB 3193, May 3, 1977, Tape 44, Side 1 (statement of Rep David Frohnmayer). "Perhaps," proposed Folberg, one of the chief drafters and a family law professor from the University of Oregon, "there could be a clarification * * * so the status of the donor as anonymous is protected." *Id.* The subcommittee rejected that proposal, and Frohnmayer gave an additional example about "a couple who were not clear whether or not they'd be able to have a child * * * and there was some discussion as to whether or not [the husband's] brother ought to be the sperm donor, and it was agreed upon [by the couple] that that would be ideal." *Id.* Frohnmayer wondered, "How do you deal with that question?" *Id.* Dr. Miles Novy, a physician and OHSU professor, responded that, in practice at that time, most doctors sought to preserve the anonymity of donors, and another doctor noted that, in the current program which they were a part of, none of the donors were known donors. Even though most donations proceeded anonymously, Novy suggested that requiring anonymity in the legislation "would be a mistake" because "in time there might be particular * * * exceptions" to the expectation that donors would be anonymous. *Id.*

That discussion indicates that anonymous, nondirected donation was the most common and conventional type of donation in practice at that time. But the discussion also

indicates that the legislature was considering the possibility of more complicated scenarios involving known donors, such as the "brother" in Frohnmayer's example. Despite having that possibility in mind, the legislature *did not* narrow the bill to cover only anonymous, nondirected donation. Folberg expressly proposed limiting the statute to apply to anonymous donors and protect their anonymity, but that proposal was rejected. Thus, the discussion quoted above indicates that the legislators expected ORS 109.239 to cover all situations involving artificial insemination except where the semen was coming from the mother's husband. There is no indication in the text, context, or legislative history that the legislature meant to silently exclude a whole class of children born through AI merely because their parents knew the identity of their sperm donor.

We therefore understand the term "donor" in ORS 109.239 (1977) to carry its plain meaning, that is, an individual who is a source of biological material, or an individual from whom blood, tissue, or an organ is taken for transplantation. "Donor" encompasses those who are known to the recipient, such as the birthing person's spouse or a known donor, as well as anonymous donors.

In this case, Schnitzer and Sause are positioned equally with respect to ORS 109.239 (1977). Both Schnitzer and Sause signed standard donation forms from OHSU that acknowledged relinquishment of any claim to or jurisdiction over future embryos and offspring, and contributed gametes to the ART process, and neither of them gave birth to S or were the spouse of the person who gave birth. Therefore, neither Schnitzer nor Sause have any "rights, obligations or interest" with respect to S simply based on their genetic connection to S.

Instead, Schnitzer's parentage of S arises from his surrogacy agreement with the gestational carrier and her husband. At the time of S's birth, Oregon law presumed that the birthing person and her husband were S's legal parents. *See* ORS 109.070(1) (2015). That changed when the trial court entered the stipulated judgment—based on the agreement between the gestational carrier, her husband, and Schnitzer—declaring that the carrier and her husband

were not the intended parents, and that Schnitzer, and only Schnitzer, was the intended parent. As Sause correctly stated in her brief, "ORS 109.065(2) creates a presumption that the woman who births a child is the child's mother, but that presumption was overcome in this case by the gestational surrogate's contractual agreement that she would not be [S's] mother."

This court has never addressed an ART contract, but the Court of Appeals has and has held that surrogacy contracts and other ART contracts are generally enforceable under Oregon law. *See, e.g.*, *McIntyre v. Crouch*, 98 Or App 462, 472, 780 P2d 239, *rev den*, 308 Or 593 (1989), *cert den*, 495 US 905 (1990) (holding that Oregon statute either did not or constitutionally could not prevent an unmarried sperm contributor in AI from establishing parental rights through contract with the birthing parent); *Leckie and Voorhies*, 128 Or App 289, 293, 875 P2d 521 (1994) (enforcing AI contract barring donor from asserting parental rights); *In re Adoption of Baby A and Baby B*, 128 Or App 450, 453, 877 P2d 107 (1994) (payment of money to a birth mother pursuant to a surrogacy contract did not invalidate her consent to the adoption of her birth child by the adoptive parents); *Weaver v. Guinn*, 176 Or App 383, 388, 31 P3d 1119 (2001) (deciding not to enforce the parties' written artificial insemination agreement because the child was conceived through sexual intercourse and not AI);; *Dahl and Angle*, 222 Or App 572, 194 P3d 834 (2008), *rev den*, 346 Or 65 (2009) (upholding agreement regarding the disposition of embryos created through IVF, as established "at the time that they underwent the IVF process").

Oregon statutes do not expressly address the enforceability of ART contracts, but several of them reinforce the approach taken by the Court of Appeals in the cases cited above. ORS 109.230 provides, for example, "Any contract between the mother and father of a child born out of wedlock is a legal contract, and the admission by the father of his fatherhood of the child is sufficient consideration to support the contract." Likewise, ORS 163.537(2)(d) expressly permits payment of "fees for services in an adoption pursuant to a surrogacy agreement." Both of those statutes support

the proposition that families can determine their structure through contract, within the general bounds of public policy regarding children and parents. More fundamentally, the ability to determine family structures through contract is consistent with the institution of marriage, which is, in part, a form of contract that has served for millennia to create stable and predictable family structures involving both parents and children. *See* ORS 109.070 (creating a rebuttable presumption that a child is the legal child of their birth mother's spouse); William Blackstone, 1 *Commentaries on the Laws of England* 443 (1765) ("The main end and design of marriage therefore [is] to ascertain and fix upon some certain person, to whom the care, the protection, the maintenance, and the education of the children should belong[.]").

Here, the gestational carrier and her husband, together with Schnitzer, stipulated that Schnitzer—and not the carrier or her husband—was S's intended parent, as they had effectively agreed upon beforehand. Had Sause been a party to that agreement, her parentage might have been established as well. But, as noted above, she was not asked to be a party to that agreement, although she expected and knew that Schnitzer was working with a gestational carrier to have a son.

In sum, we conclude that Sause's genetic connection to S does not afford her a presumption of legal parentage of S, under Oregon statutes or common law.[7]

## C.   *Parentage Under Federal and Other State Law*

Sause also argues that this court should look to California and federal cases as providing a basis for her claim of parentage as to S. We briefly explain why those authorities do not support Sause's position here.

---

[7] Justice Bushong's contrary conclusion has the potential effect of increasing litigation and uncertainty for families who use ART where, for example, a gamete donor who was known to the intended parents at the time of donation later attempts to establish parentage based on their genetic connection to the child. As *amici* note,

"[T]he only question [when determining whether a gamete contributor is a donor] is whether a person donated a gamete for use in assisted reproduction without an agreement between the parties that they would both be parents. If the answer is yes, the donation cuts off all parental rights and responsibilities. Nothing else matters."

Sause relies on a case from the California Supreme Court, *K.M. v. E.G.*, 37 Cal 4th 130, 117 P3d 673 (2005), where K.M. provided eggs that were used to impregnate her female partner, E.G., who gave birth to twins. The couple later broke off their relationship, and they disputed whether K.M. was a legal parent of the twins. Applying a similar statutory scheme to pre-SB 512 Oregon law, the California Supreme Court held that K.M. was a parent based on her genetic connection to the twins. *Id.* at 138, 117 P3d at 678.

In Sause's view, *K.M.* supports her argument that her genetic connection to S alone is sufficient to establish parentage. We disagree. *K.M.* involved different facts, policies, and law, and we are unpersuaded by *K.M.*'s reasoning as applied to this case. The issue in *K.M.* was "the parental rights and obligations, if any, of a woman with regard to a child born to her partner in a lesbian relationship." *Id.* at 134, 117 P3d at 675. The court evidently was focused on how to apply statutes written with straight couples in mind to lesbian couples; the court did not consider the broad implications of ART for parentage law (the California Family Code was later amended to address that issue), even though the court relied on the genetic connection between K.M. and the twins. The core conclusion of *K.M.* was that

> "[California] Family Code section 7613, subdivision (b) [(1992)], which provides that a man is not a father if he provides semen to a physician to inseminate a woman who is not his wife, does not apply when a woman provides her ova to impregnate her partner in a lesbian relationship in order to produce children who will be raised in their joint home."

*Id.*, 117 P3d at 675. As that quote indicates, at the time that K.M. provided her eggs, she was in a committed relationship with E.G., and they planned to raise the children in their joint home. *See id.* at 139, 117 P3d at 679 (noting that, although the parties' shared intent at the time of conception was disputed, it was undisputed that "the couple lived together and that they both intended to bring the child into their joint home"). K.M. testified that "she only agreed to provide her ova because she and E.G. had agreed to raise a child together," and that she would not have done so "had she known E.G. intended to be the sole parent." *Id.* at 135,

117 P3d at 676. K.M. had no other reason to retrieve her eggs.

By contrast, at the time that Sause gave her eggs to Schnitzer, the two were not in a committed relationship, nor did they plan to raise resulting children in a joint home. Sause had already decided to have her eggs retrieved "for her own purposes, independent of Schnitzer's plans to have a male child through ART," as the trial court found. Unlike K.M., Sause "always intended Schnitzer to have complete legal control over any male embryos," along with "sole legal custody of any male offspring," but hoped to have only a "parenting role" with those offspring. In other words, whereas K.M. intended to be a full legal parent, and both parties in *K.M.* intended to raise the resulting children together, Sause hoped to achieve an undefined quasi-parenthood by being "known as the mother," but not retaining any authority or responsibility over S. In this instance, those factual differences, as well as the fact that *K.M.* did not directly address the legal issues presented here, lead us to reject *K.M.* as persuasive authority in this case.

Having concluded that Sause is not S's parent under state law, we turn to whether Sause has any protected liberty interest in being a parent of S under federal law. Sause contends that she has a federal due process right in relation to S under the standard articulated in *Lehr*, 463 US at 262. In *Lehr*, the child of an unmarried biological father was in the process of being adopted, and the father argued that he had the right to notice and the opportunity to be heard in the adoption proceeding under the Due Process Clause. *Id.* at 250. The Supreme Court rejected that argument and held that he did not have those rights because he had failed to grasp the opportunity "to develop a relationship with his offspring" or accept "some measure of responsibility for the child's future." *Id.* at 262. The Court explained that, "[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the Due Process Clause." *Id.* at 261 (internal quotation marks, citation, and brackets omitted).

*Lehr* does not apply here because, for the reasons discussed above, Sause is not S's legal parent as a matter of state law. Unlike the father in *Lehr*, whose claim to legal parentage based on being the natural father was assumed, Sause does not have a viable state law basis for legal parentage. As Sause's brief puts it, "[t]he *Lehr* standard was established by the U.S. Supreme Court for application in circumstances when the state strips a person of parental rights, not for the purpose of determining whether a person is a parent in the first place." *See Lehr*, 463 US at 258 (noting that the state's termination of a parent-child relationship "must be accomplished by procedures meeting the requisites of the Due Process Clause" (internal quotation marks omitted)). But the state is not stripping Sause of parental rights because, as we have explained, Sause was never "a parent in the first place" under state law. As the Court observed in *Lehr* itself, "[i]n the vast majority of cases, state law determines the final outcome." *Id.* at 256. This case is in that vast majority.[8]

_____

[8] In her dissent, Justice Linder argues that Sause *does* have a protected parental interest under state law and the Due Process Clause based on *Lehr*. 371 Or at __ (Linder, S.J., dissenting) (so at 1:2-4, 11:8-13). Given our conclusion that Sause does not have a protected interest under state law, we do not reach the federal issue.

Moreover, the context of *Lehr* differs from that of this case, because the child in *Lehr* was conceived through intercourse and not through ART or AI. As Judge Mooney's concurrence below explained, "Most of the cases on which [the lead opinion and dissent] rely for the 'right to grasp' for parental rights do not concern ART. They concern children conceived through sexual intercourse, and they are distinguishable for that reason." *Sause*, 312 Or App at 110 (Mooney, J., specially concurring). The concurrence suggested that the law provides a rebuttable presumption of parentage for children conceived through sexual intercourse "because sexual intercourse serves purposes in addition to procreation. The intent of the parties using ART," by contrast, "is much clearer," *id.* at 109, and the legal rules applicable to conception and parentage resulting from ART are not necessarily the same as those applicable to conception and parentage resulting from sexual intercourse.

Here, although the genetic link between Sause and S is biologically the same as the link between the father and child in *Lehr*, what that link legally signifies is different. When a child is conceived through sexual intercourse, a genetic link between a person and the child demonstrates only that that person participated in that intercourse. When a child is conceived through ART, the genetic link generally demonstrates that that person contributed their gamete through medical procedures for the express purpose of creating a child and pursuant to whatever agreements existed between the gamete contributor and intended parent. In sum, *Lehr* does not apply here, and Sause does not have a liberty interest regarding S that is protected by the Due Process Clause.

D.   *Sause's Potential Contractual Rights and the Nudelman Agreement*

Although we have concluded that Sause is not S's legal parent by virtue of her genetic link to S as a matter of state or federal law, that does not end our inquiry. As we have described above, Schnitzer's parentage and parental rights with respect to S were determined through his agreement with the gestational carrier and her husband, and the stipulated judgment based on that agreement. Schnitzer and Sause had their own, separate agreement—the Nudelman agreement—regarding their gametes, their embryos, and S. And, as also noted above, their relationship and mutual understanding was different from an anonymous donation process where the parties expect the donor to have no relationship or contact with their genetic offspring. Instead, as the trial court found, both parties agreed that Sause would play some type of "mothering role" with respect to S, and they did not expect her identity to be kept from S, among other shared intentions.

The parties have generally not framed their arguments in contractual terms in this court. Both the trial court and Court of Appeals started with the proposition that Sause's genetic connection to S made her a presumptive parent under Oregon law, and then considered whether Sause had met the *Lehr* requirement of grasping the "opportunity" and accepting the "responsibility" of parenthood for that connection to result in legal parenthood. Presumably for that reason, the parties' briefs on review develop those arguments, but do not discuss any contractual claims that Sause may have regarding a relationship with S. Nevertheless, the role of the Nudelman agreement and its effect on the relationships among Sause, Schnitzer, and S was at issue in the trial court and in the background throughout these proceedings, and we turn to that agreement now.

Neither party argues that the Nudelman agreement affirmatively establishes Sause's claim of legal parentage of S.[9] Indeed, although Schnitzer's agreement with the

---

[9] In the trial court, Sause expressly disclaimed the position that the Nudelman agreement granted her parentage of S, stating, "Sause does not assert the Nudelman Agreement as the source of her parental rights. Rather, her rights

gestational carrier unambiguously established *his* intended parentage of S, the Nudelman agreement unambiguously does not establish Sause's intended parentage.[10] There is no affirmative statement of intended parentage, nor would section 2 of the agreement, quoted above—which limited Sause's contact with and responsibility for S—be consistent with an agreement establishing intended parentage.

But both parties maintain that the Nudelman agreement and other documents executed by the parties play some role in discerning their shared intentions. For example, Sause argues in this court that "the Nudelman Agreement expressly preserved a role for [Sause] as [S's] maternal parent." And the parties placed the significance of the Nudelman agreement squarely before both the trial court and the Court of Appeals. In the trial court, Sause argued that the Nudelman agreement "memorializ[ed] her intent to be a parent of any resulting offspring" and that she signed it "with the reasonable understanding that its core terms would govern and control the impact of any additional documents signed" in the process. Schnitzer argued in the trial court that the Nudelman agreement should be enforced and stated, "the review of the contract that was executed by both parties grants Ms. Sause no rights. It limits whatever rights she may have." In other words, although Schnitzer argued that Sause had no rights with respect to S, parental or otherwise, he recognized that the Nudelman agreement was relevant to determining those rights.

In the Court of Appeals, Schnitzer shifted his position slightly and expressly recognized that Sause may have a future role in S's life and that the Nudelman agreement would at least partially define that role, within the bounds of public policy:

"Nothing in Section 2 [of the Nudelman agreement] would preclude [Sause] in the future from playing a role in the

---

result from the undisputed fact that she is the biological and genetic mother of the child, together with the fact that she has never knowingly and intentionally waived her parental rights."

[10]  The trial court held that the Nudelman agreement did not effectively *waive* any parental rights that Sause may have had, a conclusion that we do not question here. But that is a different question from whether the agreement *created* any contractual, nonparental rights regarding Sause's relationship with S.

child's life, either through agreement with Schnitzer (his testimony shows no intent to shut Sause permanently out of the child's life) or if necessary through a binding third party determination of the child's best interests, and an order to that effect."

Additionally, both parties sought attorney fees on the basis that they were enforcing the Nudelman agreement, indicating that the significance of the agreement was squarely before the trial court.

Thus, the legal effect of the Nudelman agreement has been contested at all stages of this case. Because the trial court determined that Sause was a legal parent of S and proceeded on federal constitutional grounds, however, the parties have not had a meaningful opportunity to litigate the extent to which the Nudelman agreement, or any other agreement between the parties, affirmatively establishes any nonparental rights that Sause may have with respect to S.

Whether a gamete donor like Sause can seek limited rights to visitation or contact with S based on her agreements with Schnitzer is not a question that Oregon courts have considered. As the use of ART has increased, however, so too has the need for the enforcement of contracts between intended parents, gestational surrogates, and gamete donors for the sake of determining parentage or nonparental, contractual rights, as this case has illuminated. *See* Maria E. Garcia, *In with New Families, Out with Bad Law: Determining the Rights of Known Sperm Donors Through Intent-Based Written Agreements*, 21 Duke J Gender L & Pol'y 197, 219 (2013) (discussing the importance of recognizing and enforcing written agreements between known donors and intended parents).

Similarly to the way that a "birth relative" and an adoptive parent may enter into a written agreement to permit continuing contact between the birth relative and the child under ORS 109.268(2), for example, an intended parent and a known gamete donor in an ART context presumably may enter into a written agreement for potential contact between the donor and the resulting child. As discussed above, that and other statutes support the proposition that

families can determine their structure through contracts and agreements, within other statutory and constitutional limitations.

As Schnitzer recognized in his brief, "[a]ny court has authority to refuse enforcement to provisions of a contract, but the standard for doing it is strict. Public policy is 'a very unruly horse,' and a court will not override contracting parties' will on that basis without an 'overpowering' reason." (Quoting *Harrell v. Travelers Indemnity Company*, 279 Or 199, 206, 213, 567 P2d 1013 (1977).) Public policy factors, including the best interests of the child and the parent's ability to make the "best decisions concerning the rearing of that parent's child[]," *Troxel v. Granville*, 530 US 57, 68-69, 120 S Ct 2054, 147 L Ed 2d 49 (2000), will be important factors in a court's decision to enforce a written agreement for visitation or contact. Whether those factors "overpower" the parties' written agreement will be issues for a trial court to decide based on the facts, the specific statutes that may apply to the relationships at issue, and the parties' arguments.

We therefore conclude that, although the Nudelman agreement does not establish that Sause is a legal parent of S, Sause may have bargained for certain nonparental rights with respect to S. As we have noted above, surrogacy and other ART contracts are generally enforceable within the bounds of public policy. Because the trial court concluded that Sause was a legal parent of S, with all the rights and responsibilities of that legal status—a determination that we have concluded was legal error—the court did not determine the extent of legally enforceable contractual rights that Sause may have based on her written and unwritten agreements with Schnitzer. On remand, the parties will have the opportunity, if they wish, to litigate the extent of Sause's nonparental rights with respect to S, and the court may determine the extent to which those rights are enforceable. The trial court will be tasked with evaluating any agreements between Sause and Schnitzer, including the Nudelman agreement, pursuant to the framework set out in *Yogman v. Parrott*, 325 Or 358, 937 P2d 1019 (1997), which may require consideration of extrinsic evidence of the

parties' intent in the time leading up to the formation of the agreement.

Finally, we note that Justice Bushong's dissent asserts that we are holding that "Oregon law allows a person to 'contract into' parental rights without going through adoption procedures," which it contends is legal error. 371 Or at __, ___ (Bushong, J., dissenting) (so at 33:8-10, 35:10-19). It then states that, if Schnitzer can become a parent through a contract—and not based on his genetic connection to S—then Sause can as well. 371 Or at ___ (so at 34:20 - 35:2). We disagree. First, Schnitzer's parentage is not at issue in this case. No one disputes that he is a legal parent of S, based on his surrogacy agreement and the stipulated judgment in the declaratory judgment proceeding, and no party questions his status as S's legal parent or argues that he must go through adoption procedures to become a legal parent. Second, we are not remanding for a determination of whether Sause can establish "parentage" through contract. We have already held that she is not S's legal parent. Rather, we remand because she and Schnitzer had at least one written agreement related to S, and Sause may have enforceable, nonparental, contractual rights under that agreement. Although a right to be known to a child, to visit, or to have an ongoing relationship may certainly overlap with some "parental" rights, when their source is an agreement with the intended parent—as may be the case here—those rights do not establish one's legal parentage.[11]

---

[11] As noted, Justice Bushong's dissent contends that, if Schnitzer can "contract into" legally cognizable parental rights, then Sause can, too, under the "equality principle." 371 Or at ___ (Bushong, J., dissenting) (so at 31:17 - 32:1). That is incorrect. Among other factual and legal differences in their circumstances, discussed above, Schnitzer had a surrogacy contract with S's legal parents at birth (the gestational carrier and her husband) consenting to Schnitzer's intended parentage, while Sause did not. Thus, Schnitzer was able to challenge the legal parents' parentage under ORS 109.070(2)—which provides that the parentage of a birth mother and her spouse "may not be challenged by a person other than a spouse as long as the spouses are married and are cohabitating, *unless both spouses consent to the challenge*" (emphasis added)—and obtain a declaratory judgment establishing his parentage. But Sause did not have the consent of the legal parents, so an effort by her to challenge their parentage would be barred by that statute.

Justice Bushong's dissent also makes a number of potentially broad statements about Oregon parentage law, including that there can be no contractual basis for parentage except through adoption and that "[c]ontracts in this context can *terminate* parental rights arising from other presumptions of parentage,

### E.  *Attorney Fees*

We briefly turn to the question of attorney fees. Schnitzer was awarded attorney fees on appeal, and Sause now challenges that award. Sause did not, however, raise that issue in her petition for review, nor did she amend her petition for review to include that issue after the Court of Appeals had awarded Schnitzer attorney fees, so it is not before this court. *See* ORAP 9.20(2) ("[T]he questions before the Supreme Court include all questions properly before the Court of Appeals *that the petition or the response claims* were erroneously decided by that court." (Emphasis added.)); *see also* ORAP 9.17(2)(b)(i) ("[T]he brief [on the merits on review] may not raise additional questions or change the substance of the questions already presented [in the petition for review]."); *Parrott v. Carr Chevrolet, Inc.*, 331 Or 537, 541 n 3, 17 P3d 473 (2001) (relying on ORAP 9.17(2)(b)(i) and ORAP 9.20(2) to decline consideration of the defendant's request to reverse an award of attorney fees that the defendant had made in its brief on the merits, but not in its petition for review). And, "[a]lthough this court has discretion to consider 'other issues that were before the Court of Appeals,'" we decline to do so here. *Miller v. City of Portland*, 356 Or 402, 410 n 4, 338 P3d 685 (2014) (quoting ORAP 9.20(2)).

### III.  CONCLUSION

Schnitzer wanted to have a son through ART, and Sause gave Schnitzer her eggs to support that process. As explained above, in these circumstances, Sause's genetic link to S does not make her his legal parent. At the same time, both she and Schnitzer hoped that she would play some role in S's life, and agreements between them provide a basis for Sause to seek to prove those contractual rights. We therefore reverse the judgment of the trial court and remand for further proceedings in that court to declare the legal parentage of S and to determine the extent of Sause's contractual, nonparental rights, if any, with respect to S.

---

but they cannot *create* parental rights on their own." 371 Or at __ (Bushong, J., dissenting) (emphases in original) (so at 31:15-17). Those statements are offered without citation to case law or statute, and may well be at odds with the understanding of many of those involved in the ART process.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**BUSHONG, J.,** dissenting.

Petitioner Sause contributed eggs that were fertilized through in vitro fertilization (IVF) with sperm supplied by her then-boyfriend—respondent Schnitzer—and implanted in a gestational surrogate, resulting in the birth of a child, S. The majority opinion concludes that neither biological parent has any legally cognizable parental interest in S based on their genetic connection. Instead, the majority opinion concludes that Schnitzer is S's legal parent based on his contract with the gestational surrogate and her husband, and that Sause *might* have some contractual—but not parental—interest in S, to be determined on remand. Because I disagree with the majority opinion's conclusions and the legal analysis it utilizes to reach those conclusions, I respectfully dissent.

In my view, Sause's undisputed genetic link to S does not automatically make her a legal parent, but it does give her a parental interest that has legal significance—just as Schnitzer's genetic link gave him a parental interest that has legal significance—under Oregon parentage law and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The majority opinion's conclusion that neither genetic parent has any legally significant parental interest is, in my view, based on a misreading of the law. Further, I agree with the trial court that nothing in Oregon parentage law or the written agreements and consent forms that Sause signed as part of the assisted reproductive technology (ART) process precluded the trial court from determining that Sause was S's legal parent. And the majority opinion's conclusion that Schnitzer has "contracted into" a parental interest, is, in my view, both unprecedented and contrary to established Oregon law. Accordingly, I dissent.

## I.  DISCUSSION

A.  *Sause has a legally protected parental interest under Oregon law.*

I agree with the majority opinion that Sause's genetic link with S does not by itself make Sause a legal parent. But, in my view, that link does give rise to a parental interest that has legal significance under Oregon parentage law. The majority opinion misinterprets Oregon law in reaching a contrary conclusion. To understand the role that genetics plays in Oregon parentage law, it is helpful to place that law in the context of its common-law roots and its historical evolution, as the majority opinion has done. However, the majority opinion's historical overview is incomplete.

What is missing from the majority opinion's overview is a discussion of the legislature's enactment of an "equality principle" in response to legal presumptions that subordinated women to men under the common law and how that principle applies to help resolve disputed parentage claims today. Originally, Oregon law adhered to the marital presumption, which conclusively established that the man married to a child's mother is the child's legal father. That presumption and related concepts in the common law and early statutes reflected the law's misogynistic approach to parentage. By overlooking the legislative response to the law's historical mistreatment of women, the majority opinion misinterprets the role that genetics has always played in Oregon parentage law. I begin with the omitted portion of that overview.

The conclusive marital presumption was consistent with criminal laws, social norms, and religious doctrines forbidding women to have sex outside of marriage. *See* Joanna L. Grossman, *Thoroughly Modern Motherhood*, 74 SMU L Rev 277, 280-81 (2021) ("The marital presumption * * * represented not only the state's best guess as to the father of a married woman's child but also the state's normative preference. Sex with anyone else was taboo, even illegal perhaps * * *."). Courts prohibited anyone from disputing the marital presumption through evidence that the husband could not have fathered the child because he was infertile or lacked

sexual access to his wife. *See Westfall v. Westfall*, 100 Or 224, 239, 197 P 271 (1921) ("It is well settled on grounds of public policy, affecting the children born during the marriage, * * * that the presumption of legitimacy as to children born in lawful wedlock cannot be rebutted by the testimony of the husband or the wife[.]"); Douglas NeJaime, *The Nature of Parenthood*, 126 Yale LJ 2260, 2272 (2017) (noting that, if a child was conceived outside of marriage, the presumption "allowed the husband to pretend he was the biological and thus legal father * * * [and] the couple themselves could not penetrate the presumption with inconsistent biological facts").

That conclusive marital presumption, along with the harsh treatment of "illegitimate" children at common law, "reflected and enforced a gender-hierarchical order" whereby "marriage subordinated women to men in both the spousal and parenting relationship." NeJaime, 126 Yale LJ at 2273. The subordination of married women to their husbands was further reflected in the common-law rule that fathers were entitled to the custody of their minor children as against the children's mothers and all other persons. *Bryant v. Dukehart*, 106 Or 359, 370, 210 P 454 (1922). That rule was based on the principle that "the husband and wife were a legal unit, and that the rights of the husband and wife were exercised by the husband alone." *Id.*

In 1880, the legislature responded to that inequality by enacting an "Act to Establish and Protect the Rights of Married Women" (the 1880 Act).[1] The Codes and General Laws of Oregon, ch XVIII, title I, § 2878 (Hill 1887). The 1880 Act provided:

> "Henceforth the rights and responsibilities of the parents, in the absence of misconduct, shall be equal, and the mother shall be as fully entitled to the custody and control of the children, and their earnings, as the father, and in case of the father's death the mother shall come into as full and complete control of the children and their estate as the father does in case of the mother's death. All laws and

---

[1] Although the title of the 1880 Act stated that it established and protected the rights of "married women," its text refers to the rights and responsibilities of "the mother" without limiting those rights and responsibilities based on the mother's marital status.

portions of law inconsistent with the foregoing are hereby repealed."

That provision abrogated the common-law rule that had vested superior custodial rights to the father over the mother. It did so based on a recognition of "the nurturing of children that mothering brought" and thus provided more protections for women to retain custody over their children upon the father's absence. Philip F. Schuster II, *Constitutional and Family Law Implications of the* Sleeper *and* Troxel *Cases: A Denouement for Oregon's Psychological Parent Statute?*, 36 Willamette L Rev 549, 564-65 (2000).

The enactment of the 1880 Act placed women on more equal footing by giving both biological parents—including mothers—the right to custody of their children unless they were unfit or unable to care for their child. *See Barnes v. Long*, 54 Or 548, 550, 104 P 296 (1909) (noting that, in a divorce decree, "the custody of the child was given to the wife, and properly so"). In *Ingalls v. Campbell*, 18 Or 461, 469, 24 P 904 (1889), this court noted that, although the 1880 Act did not give mothers the right to appoint a testamentary guardian, the statute did give mothers "equality of rights as to the custody of the children." The "equality principle" adopted in the 1880 Act has been retained in Oregon's parentage statutes and is now codified in slightly reworded form as ORS 109.030.

In more recent decades, Oregon parentage laws have evolved to eliminate illegitimacy and recognize paternity based on a man's actual and acknowledged genetic connection with a child. In 1953, Oregon enacted the "Uniform Act on Blood Tests to Determine Paternity" (the 1953 Act). Or Laws 1953, ch 628. The 1953 Act authorized courts to use blood types to determine "the possibility of the alleged father's paternity[.]" *Id*. § 4.[2] That provision, which is codi-

---

[2] The 1953 Act provided, in part:

"Section 1. In a civil action under title 28, chapter 9, O.C.L.A., in which paternity is a relevant fact, the court, upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved may, or upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests. If any party refuses to submit to such tests, the court may resolve

fied as ORS 109.258, establishes a "disputable presumption of paternity" if blood or DNA testing shows a genetic link between the man and the child. *See* Or Laws 1995, ch 608, § 5 (amending the definition of "blood tests" in ORS 109.251 to include DNA testing as an approved method of determining paternity).[3]

In 1975, the legislature amended ORS 109.070 to allow the filing of a "joint declaration of paternity" supported by sworn statements "of the natural father and the mother that the natural father is the father of the child and that there is no legal father." Or Laws 1975, ch 640, § 3. That law was subsequently amended in 1995 to allow a putative father to file a "voluntary acknowledgment of paternity." Or Laws 1995, ch 514, § 7. Such a filing "establishes paternity as a rebuttable presumption for all purposes." *Id.*

Although this court had noted in 1959 that "the modern trend [was] away from the rule of conclusiveness," *Burke v. Burke*, 216 Or 691, 697, 340 P2d 948 (1959), the Oregon legislature did not abolish the conclusive marital presumption until 2007, when it made the presumption rebuttable in all circumstances. *See* Or Laws 2007, ch 454, § 1 (amending ORS 109.070).[4]

As a result of those legislative actions, modern Oregon parentage law explicitly relies on either marriage or a genetic connection—established through blood or

---

the question of paternity against such party or enforce its order if the rights of others and the interests of justice so require.

"* * * * *

"Section 4. If the court finds that the conclusions of all the experts, as disclosed by the evidence based upon the tests, are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly. If the experts disagree in their findings or conclusions, the question shall be submitted upon all the evidence. If the experts conclude that the blood tests show the possibility of the alleged father's paternity, admission of this evidence is within the discretion of the court, depending upon the infrequency of the blood type."

Or Laws 1953, ch 628, §§ 1, 4.

[3] By the mid-1990s, DNA testing had "progressed to the point where the reliability and validity of properly collected and analyzed DNA data should not be in doubt." *State v. Lyons*, 324 Or 256, 267, 924 P2d 802 (1996); *see also* Jill Adams, *Paternity Testing: Blood Types and DNA*, 1 Nat Educ 146 (2008).

[4] Under ORS 109.070(2), the statutory rebuttable presumption may be challenged by either spouse or by a third party with the consent of both spouses.

DNA tests, or through filing a written acknowledgment—between a man and his offspring to establish a presumption of paternity. Historically, maternity was not a disputed issue; the woman giving birth had an undeniable biological and genetic link to the child and was thus legally the child's mother. But advances in reproductive technology—initially, artificial insemination (AI),[5] and later, in vitro fertilization (IVF)[6]—have changed the landscape, and the law has slowly (and incompletely) responded.

Until it was abolished in 2007, the conclusive marital presumption—which treated the husband of the birth mother as the child's legal father—continued to be applied, though it applied only to a husband "who was not impotent or sterile at the time of the conception of the child." ORS 109.070(1)(a) (2005). AI made it possible for men who did not want to become "fathers" to donate semen to help infertile couples conceive a child, resulting in a genetic connection between the donor and the child without the corresponding parental rights and responsibilities. AI also made it possible to inseminate a surrogate mother who would give birth to a child for the intended parents, without ever intending to become a parent herself. Although the surrogate would have a biological and genetic connection with the child, like a semen donor, surrogates generally did not want to have any parental rights or responsibilities.[7] Later, IVF made it

---

[5] Artificial insemination (AI) was first reported in the late 1700s and entered wider use between the 1950s and 1970s. *See* W. Ombelet & J. Van Robays, *Artificial Insemination History: Hurdles and Milestones*, 7 Facts Views Vis Obgyn 137, 138, 140 (2015). Through AI, conception could occur, for the first time in history, without sexual intercourse. There were essentially two types of recognized AI: artificial insemination by husband (AIH) and artificial insemination by donor (AID). *See* George P. Smith, II, *Through a Test Tube Darkly: Artificial Insemination and the Law*, 67 Mich L Rev 127, 128 (1968).

[6] In vitro fertilization (IVF), which was first used successfully in 1978, involves combining eggs and sperm in a laboratory setting and implanting the resulting zygote into a uterus. IVF made egg donation and gestational surrogacy possible, meaning that, for the first time, a gestational parent might not be a genetic parent. Grossman, 74 SMU L Rev at 292.

[7] The parties' intent was usually memorialized in a surrogacy agreement whereby the surrogate agreed to the procedure and agreed to waive her parental claim to the child in favor of the intended parents. Although this court has never addressed surrogacy agreements, the Court of Appeals has addressed them. *See In re Adoption of Baby A and Baby B*, 128 Or App 450, 877 P2d 107 (1994) (holding that the adoption statutes did not prohibit the adoption of a child conceived through artificial insemination of a surrogate mother with the adoptive father's

possible, for the first time, for a fertilized egg to be implanted in a surrogate, who would then give birth to a child without having any genetic connection to the child. Conversely, IVF also made it possible for a woman contributing eggs to have a genetic connection to a child without giving birth to that child.

As explained more fully below, the development of AI and IVF led to some changes in Oregon parentage laws—in particular, the enactment of the donor statute, ORS 109.239 (1977)—but none of those changes eliminated, in this context, a genetic parent's legally cognizable interest in the child. Thus, under current Oregon parentage law, Sause's genetic link gives rise not to conclusive legal parentage, but to a parental interest that has some legal significance.

As noted, one of the foundations of Oregon parentage law is the 1880 Act's equality principle, which is currently codified as ORS 109.030. Before that statute was amended in 2017,[8] ORS 109.030 (2015) provided:

> "The rights and responsibilities of the parents, in the absence of misconduct, are equal, and the mother is as fully entitled to the custody and control of the children and their earnings as the father. In case of the father's death, the mother shall come into as full and complete control of the children and their estate as the father does in case of the mother's death."

Under the equality principle, parentage establishes equal rights and responsibilities to children for both mothers and fathers. Consistent with that principle, any source of parentage must also reflect an equally cognizable interest for both putative parents. For men, a genetic link between father and child has always mattered under Oregon

---

sperm); *see also Weaver v. Guinn*, 176 Or App 383, 31 P3d 1119 (2001) (holding that an "Artificial Insemination Surrogate Contract" that required the surrogate mother to relinquish custody of the child to the father was not enforceable where the child was ultimately conceived not through AI but through sexual intercourse between father and the intended surrogate mother).

[8] Oregon parentage law was modified by Senate Bill (SB) 512 (2017). Or Laws 2017, ch 651. SB 512 amended ORS 109.030, replacing the terms "mother" and "father" with "parent," consistent with the bill's recognition of parental rights in same-sex marriages. Or Law 2017, ch 651, § 50. The majority opinion concludes that SB 512 does not apply to this case. ___ Or at ___ (slip op at 17:18 - 20:4). I agree with that conclusion.

parentage law, though it has not always been conclusive. Before the conclusive marital presumption was abolished in 2007, it precluded a man from using blood or DNA testing to establish paternity over a child born to a woman married to a different man at the time of conception. But blood or DNA testing could always establish a man's paternity over a child born to an unmarried woman. After the conclusive marital presumption was abolished in 2007, being married to the birth mother at the time of conception gave rise to a *rebuttable* presumption of paternity; in some circumstances, that presumption could be rebutted by blood or DNA testing showing that someone else was the child's biological father. *See* ORS 109.070(2).[9] Similarly, filing a voluntary acknowledgment of paternity gives rise to a rebuttable presumption of paternity. Blood or DNA testing can be used to support or rebut that presumption. Thus, to establish a man's paternity, genetics has always mattered.

For women, establishing maternity was simple until IVF was developed. Aside from adoption, the only way a woman could establish maternity was by giving birth to the child, resulting in an undeniable biological and genetic link between them. The widespread use of AI did not change things for women; the birth mother—even a gestational surrogate—would still have a biological and genetic connection with the child.[10] But when it became possible to fertilize a woman's eggs through IVF and implant the resulting embryo in a gestational surrogate, the possibility arose for the first time that the birth mother would not have any genetic connection to the child.

Under Oregon law, a woman can establish a presumption of parentage by giving birth to a child. ORS 109.065(1)(a). There is no express statutory mechanism allowing a woman to establish her parental interest by filing a voluntary acknowledgment of maternity or through

___

[9] Under ORS 109.070(2), the presumption of paternity arising from marriage or the filing of a voluntary acknowledgment of paternity "may be challenged in an action or proceeding by either spouse," and it may be challenged by any other person if both spouses consent to the challenge.

[10] As discussed above, a gestational surrogate impregnated using AI could sign a "Surrogacy Agreement" that committed her to surrender the child at birth to the intended parents, who would adopt the child, as in *In re Adoption of Baby A and Baby B*, 128 Or App at 453.

blood or DNA testing showing her genetic link to the child. However, Oregon law does recognize that a woman other than the birth mother can be declared a child's legal parent. *See* ORS 109.065(1)(c), (h). In *Thom v. Bailey*, 257 Or 572, 588, 481 P2d 355 (1971), we held that the statute stating that parentage could be "established or declared by another provision of law" (ORS 109.065(1)(h)) authorized a person claiming a right to inherit from a deceased "parent" to file a declaratory judgment action to establish paternity. Consistent with our decision in *Thom*, a woman can seek to establish parentage by filing a declaratory judgment action, as Sause did in this case. And, under a statute enacted in 2013, ORS 432.088(8),[11] a person claiming to be a child's parent can seek a court order requiring that person to be listed as a parent on the child's birth certificate, which Sause requested in this case.

However, the current statutes do not explain how a court should resolve a woman's parentage claim in this context, nor do they expressly state that a woman with a genetic link to a child conceived through IVF can establish parentage in the same way as a man. But, consistent with the equality principle under ORS 109.030, it is highly unlikely that the legislature intended to place genetics at the forefront of a man's parentage claim while making genetics irrelevant to a woman's parentage claim. Rather, the best reading of these statutes is that the legislature intended to treat men and women equally with respect to their parentage claims, consistent with the equality principle that has existed in various forms since 1880.[12]

---

[11] ORS 432.088(8) provides: "For purposes of making a report of live birth and live birth registration, the woman who gives live birth is the birth mother. If a court of competent jurisdiction determines that a woman other than the birth mother is the biological or genetic mother, the court may order the state registrar to amend the record of live birth. The record of live birth shall then be placed under seal."

[12] The majority opinion suggests that the "equality principle" and the source of Schnitzer's parentage are irrelevant, contending that Schnitzer is "an undisputed parent" because creating a male child through ART "was his idea, and he took the contractual and legal steps to accomplish that, while Sause did not." __ Or at __ n 3 (slip op at 24 n 3). But legal parentage has never depended upon "whose idea" it was to have a child. The only clear contractual step that Schnitzer took was his contract with the surrogate and her husband, which is legally insufficient to "contract into" parental rights, as explained below. And the only legal step that Schnitzer took was filing a declaratory judgment action the day after

Applying that principle to the novel circumstances presented here leads to the conclusion that, under Oregon law, Sause has a legally significant parental interest in S by virtue of her undisputed genetic link to S, just as Schnitzer has a legally significant parental interest based on his genetic link to S.

The majority opinion offers two reasons why a genetic link does not matter in this context. First, the majority opinion concludes that a genetic link established through blood or DNA testing, as authorized by ORS 109.258, creates an "evidentiary presumption" that does not apply "where genetic parentage is undisputed." __ Or at __ (slip op at 27:18-19). But the majority opinion offers no reason why genetics should matter—and, in many cases, would be determinative of parentage—only for purposes of child support when genetic paternity is disputed but would be irrelevant when genetic parentage is undisputed. Moreover, the majority opinion's reasoning overlooks the fact that a biological and genetic connection has always been a basis, at least presumptively, for parentage, even before DNA and blood testing were available.

Second, the majority opinion concludes that a genetic link is irrelevant in this context because Sause's parentage claim is "foreclosed by the donor statute, ORS 109.239 (1977)," 371 Or at __ (so at 28:16-17), which the majority opinion assumes applies equally to egg donors and sperm donors, 371 Or at __, __ n 6 (so at 29:20-21, 29-30 n 6). In reaching that conclusion, the majority opinion observes that a parentage claim based on genetics under Oregon parentage law requires "an adjudication or other proceeding" in which a court "can determine whether the putative parent's maternity or paternity is a valid basis for parentage." 371

---

S's birth—which did not name Sause as a party, and which was supported by an inaccurate declaration from Dr. Patton, an OHSU physician who knew Schnitzer personally. Patton stated in his declaration that "[e]ggs were retrieved from a donor and fertilized with sperm collected from [Schnitzer]," which resulted in embryos created from "donor eggs" and Schnitzer's sperm. Patton later acknowledged under oath that he did not oversee the creation of the Sause-Schnitzer embryos, and that he was not involved in the documentation for the needed consents and directives. Patton further acknowledged that he was not "technically correct" in stating that the embryo transferred to the gestational carrier had resulted from "donor eggs."

Or at __ (citing ORS 109.258 and ORS 109.065) (so at 28:7, 10-11). However, the majority opinion's rejection of a genetic link as the basis for a legally protected interest in parentage cannot be based on the *absence* of "an adjudication or other proceeding," because the trial court determined the validity of Sause's parentage claim *in this case*. Rather, the majority opinion's conclusion hinges on its interpretation of the donor statute, ORS 109.239 (1977).

In my view, the majority opinion has misinterpreted the intended scope of that statute. I turn to that issue next.

B.    *The majority opinion misinterprets ORS 109.239 (1977), Oregon's donor statute.*

The majority opinion concludes from the text and context of ORS 109.239 (1977) that the statute "was intended to apply to all those who contributed semen for use in AI" if they were not the mother's husband and that the "[t]he available legislative history confirms that understanding." 371 Or at __ (so at 31:11-13). I disagree. In my view, the text and context of the statute show that the legislation was *not* intended to apply when semen is contributed by a man selected by the intended parents—typically a friend, intimate partner, or relative, commonly referred to as a "known" or "directed" donor—and the legislative history confirms *that* understanding.

That difference is significant, because the majority opinion concludes, based on its misreading of the intended scope of the statute, that "neither Schnitzer nor Sause have any 'rights, obligations or interest' with respect to S simply based on their genetic connection to S." __ Or at __ (slip op at 34:1-3). In my view, that conclusion is inconsistent with Oregon parentage law, as explained above, and is based on a misreading of the intended scope of the donor statute, as explained below. I begin with the text and context of that statute.

1.    *Text and context*

ORS 109.239 (1977) provided:

"If the donor of semen used in artificial insemination is not the mother's husband:

"(1)   Such donor shall have no right, obligation or inter-
est with respect to a child born as a result of the artificial
insemination; and

"(2)   A child born as a result of the artificial insemina-
tion shall have no right, obligation or interest with respect
to such donor."

That statute plainly does not apply to Sause because she con-
tributed her eggs; she is not a "donor of semen." The majority
opinion reasons, however, that, if a "donor of semen" does not
have a legally protected parental interest, then a similarly
situated "donor of eggs" also should not have a legally pro-
tected interest.

I have no quarrel with that application of the equal-
ity principle. The problem, however, is that the donor statute
was intended to apply only to husbands who donated semen
to inseminate their wives and anonymous semen donors who
did not intend to become parents or have any connection
with the child conceived using their donations. The law was
never intended to apply to known or directed semen donors
who intended to be parents, so it would not apply to known
or directed egg donors who intended to be parents either.
The limited intended scope of the donor statute is revealed
by analyzing the statutory text, in context, and is confirmed
by its legislative history.

ORS 109.239 (1977) presumed that a semen donor
could be the mother's husband or a donor who was not the
mother's husband. Or Laws 1977, ch 686, § 5. On its face, that
wording could be read to include known or directed donors
selected by the intended parents. However, that broad read-
ing is refuted by another provision enacted as part of the
same act, ORS 677.360, which provided—and continues to
provide—that only licensed physicians and those under their
supervision could perform AI, and that physicians and those
under their supervision were the only ones who could "select
artificial insemination donors." Or Laws 1977, ch 686, § 2.
Because ORS 677.360 did not give the intended parents a
role in selecting the semen donor, the 1977 donor statute was
not meant to apply to donors who were specifically selected
by the intended parents. Neither was it meant to apply to a
man not married to the birth mother who contributed his

semen to create a child he intended to parent, as Schnitzer did in this case.

Considering the words of the statute in the context of how AI terminology was used at the time confirms that the 1977 donor statute was intended to address only AI using semen donated by the birth mother's husband or by an anonymous donor whose intent was to give up his semen to help people he did not know conceive a child. ORS 109.239 (1977) was not intended to address the rights of men who contributed semen to a friend, intimate partner, or relative with the intent to become the child's parent.[13]

The context of the statute—which includes the meaning of terms used in the medical field and, more particularly, the field of reproductive technology—confirms that limited scope of the legislation. *See Comcast v. Dept. of Rev.*, 356 Or 282, 296-97, 337 P3d 768 (2006) (for statutory terms drawn from a specialized trade or field, court considers their meaning and usage in the discipline from which the legislature borrowed them). Within the medical field generally, a donor is a person "from whom blood, tissue, or an organ is taken for transplantation." *Stedman's Medical Dictionary* 536 (27th ed 2000). Blood, tissue, organs, and similar body parts or substances are donated with the intent of benefitting another already-existing human being. Donations of that type are not made for purposes of reproduction; that is, to bring a new human into the world with the genetic imprint of the donor.

---

[13] The Court of Appeals interpreted ORS 109.239 (1977) in *McIntyre v. Crouch*, 98 Or App 462, 780 P2d 239, *rev den*, 308 Or 593 (1989), *cert den*, 495 US 905 (1990). That case generated three opinions, but no majority. The ultimate disposition of the case, which had been resolved on summary judgment, was a remand for trial. Two judges agreed that the putative father in the case was a "donor" for purposes of ORS 109.239. *Id.* at 467-68 (Newman, J., lead opinion); *id.* at 474 (Richardson, J., dissenting). And two judges agreed that, if the facts were as the putative father had alleged, the statute as applied violated federal due process principles. *Id.* at 470 (Newman, J., lead opinion); *id.* at 472 (Deits, J., specially concurring). One judge would have also held that the putative father, who was known to the semen recipient and allegedly had an agreement with her to have a parental role in the child she gave birth to, was not a donor under the statute. *Id.* at 473-74 (Deits, J., specially concurring). Of significance, *McIntyre* was decided when legislature history could be considered only if a statute's terms were "ambiguous." *See Gaines*, 346 Or at 171-72 (announcing change to statutory interpretation methodology).

Within the specialized medical field of assisted reproductive technology, a donor—when not qualified by adjectives like "known" or "directed"—is anonymous by default; that is, someone who provides semen with the recipient never knowing the donor's identity and vice versa.[14] A donor in that sense has no expectation of a parental role of any kind and wants none. To the contrary, the donor looks for assurance that the donor's name will never be disclosed, so that the recipient of the semen cannot look to the donor for any form of parental support or other obligation.[15]

That understanding fits with the origins of artificial insemination as a fertility service. Sperm banks were not a reliable source of semen until the mid-1950s, when successful procedures for freezing and thawing sperm became available. Banks first existed on an informal basis at some universities, where they were privately maintained

---

[14] *See, e.g.*, Elizabeth Watkins, *Who's Your Daddy? In Vitro-Fertilization and the Parental Rights of the Sperm Donor*, 30 U Fla J L & Pub Pol'y 131, 135-37 (2019) (discussing anonymous donors and known or directed donors); Amy B. Leiser, *Parentage Disputes in the Age of Mitochondrial Replacement Therapy*, 104 Geo L J 413, 428 (2016) ("true" donor in the context of gamete donation is "someone who contributes his or her gametes to someone else with no intention of parenting the resulting child"); Paula J. Manning, *Baby Needs a New Set of Rules: Using Adoption Doctrine to Regulate Embryo Donation,* 5 Geo J Gender & L 677, 685-86 (2004) (sperm may come from a donor known to the woman or may be donated anonymously; persons who elect to use anonymous sperm generally purchase sperm from sperm banks that keep donor information confidential).

[15] No contemporaneous source in the medical or legal fields discussed the possibility of using "known or directed" donors in the practice of AI as it existed in 1977. *See* Donald W. Brodie, *The New Biology and the Prenatal Child*, 9 J Fam L 391, 395 (1970) (artificial insemination is classified as AIH when the husband's semen is used; AID where the semen of an anonymous donor is used; and combined artificial insemination (CAI) where a combination of the husband's and an anonymous donor's semen is used); *see also* Robert E. Lee, *The Changing American Law Relating to Illegitimate Children*, 11 Wake Forest L Rev 415, 419 (1975) (for AID, the identity of the third party donor is "kept an absolute secret by the doctor from even the husband and wife" while the "donor, of course, does not know the identity of the couple"); Joseph E. Carr IV, *Artificial Insemination: Problems, Policies, and Proposals*, 26 Ala L Rev 120, 121-22 (1973) (existing practice of artificial insemination is one in which semen is obtained from either the husband of the recipient or "an anonymous third party donor"). A 2002 law review article examined "anonymity" practices in the assisted reproduction field generally, beginning with AID in the 1940s and continuing up to the time the article was written, with the author arguing that the then-still-prevalent practices requiring anonymity could no longer be justified and that children are entitled to know their biological origins. *See* Mary Lyndon Shanley, *Collaboration and Commodification in Assisted Procreation: Reflections on an Open Market and Anonymous Donation in Human Sperm and Eggs*, 36 Law & Soc'y Rev 257 (2002).

by physicians for their own patients. In the early 1970s, commercial banks began to open their doors. Nationally, by 1973, there were three commercial sperm banks in existence, along with nine private banks at university medical centers and other banks maintained by physicians in private practice. Jody Lyneé Madeira, *Understanding Illicit Insemination and Fertility Fraud, from Patient Experience to Legal Reform*, 39 Colum J Gender & L 110, 131 (2019).

Semen donors during that period were university students, medical students, and hospital residents, whose semen was given anonymously and banked for future artificial insemination use by physicians. Naomi Cahn, *The New Kinship*, 100 Geo LJ 367, 374 (2012); Dominick Vetri, *Reproductive Technologies and United States Law*, 37 Int'l & Comp L Q 505, 518-19 (1988). Physicians selected the donors. Screening in those early years was casual, in part, because medical students were thought to be of "above-average intelligence and health" and likely to be more aware of the health implications of their own family histories. *See* Kathryn Venturatos Lorio, *Alternative Means of Reproduction: Virgin Territory for Legislation*, 44 La L Rev 1641, 1651 (1984) (discussing physicians' role in screening donors and selecting which donor's sperm would be used for which recipient).

In its early years, artificial insemination was often a clandestine and "fairly secret" practice. Cahn, 100 Geo LJ at 374, 391-92. The anonymity of the donors and the selection of semen donors by physicians was a paramount feature; recipients were given no other choice.

Thus, the text and context of ORS 109.239 (1977) indicate that the statute was intended to address only AI using semen donated by the mother's husband or by an anonymous donor selected by the physician. I turn to the legislative history.

### 2. *Legislative history*

The legislative history of ORS 109.239 (1977) confirms that the statute was intended to address semen donations by husbands and anonymous donors only, consistent with the accepted medical practice of AI when the

statute was enacted. The chief drafters and proponents of the 1977 bill were Jay Folberg, a family law professor at Lewis & Clark Law School; Betty Bechtel, a law student; and Dr. Nancy Alexander and Dr. Miles Novy, medical professionals involved with the sperm bank at Oregon Health & Science University (OHSU) and the University of Oregon medical school. In their written testimony, Folberg and Bechtel explained that artificial insemination had become a medically accepted procedure used to facilitate reproduction to assist with fertility issues; that donors of semen were either the husband or a third-party who usually "remain[ed] anonymous"; and that the bill was needed to avoid legal problems for all participants.[16] Exhibit 1, Senate Committee on Judiciary, HB 3193, July 2, 1977, 1 (written testimony of Professor Jay Folberg and Betty Bechtel). For the recipient, the bill was designed to ensure that a married woman could not be deemed an "adulteress" and have her marriage annulled or invalidated. *Id.* at 2. For the husband, it solved the problem that the statutory marital presumption did not apply if the husband was impotent or sterile, which was the usual case for couples using artificial insemination. *Id.* In the usual case, therefore, the husband could not establish paternity under existing law, leaving the child with no right of support and care from the husband. *Id.*[17] As for the typical anonymous donor, Folberg and Bechtel explained, he would be "an inappropriate person to hold responsible for the support and care of the child," but under existing paternity laws

---

[16] That testimony focused on husbands and wives, consistent with the fact that, in the early years, use of artificial insemination by unmarried women was rare. In addition to the social stigma of being an unmarried mother at that time, most states laws did not permit the procedure to be performed for anyone other than married couples; regardless of what state law permitted, physicians often refused to perform the procedure for unmarried women. *See* Vetri, 37 Int'l & Comp L Q at 512-19 (describing early statutes and physician unwillingness to perform artificial insemination for unmarried women); *see also* Barbara Kritchevsky, *The Unmarried Woman's Right to Artificial Insemination: A Call for an Expanded Definition of Family*, 4 Harv Women's LJ 1,2-3 (1981) (similarly describing that practice).

[17] The protection of the relationship between the child and husband was accomplished through ORS 109.243 (1977), which was another provision in the bill that enacted ORS 109.239 (1977). Or Laws 1977, ch 686, § 6. ORS 109.243 (1977) provided that, if the husband had given consent to his wife's artificial insemination, the relationship, rights, and obligations between a child born as a result of artificial insemination and the mother's husband were the same as if child were "naturally and legitimately conceived" by the mother and her husband.

he could be held responsible if his identity were to become known. *Id*.[18]

Thus, donor anonymity was a way to protect the intended parents' rights, protect the donor from paternity actions, and protect the child from paternity actions by the donor. *See* Tape Recording, Senate Committee on Judiciary, HB 3193, June 27, 1977, Tape 50, Side 1 (testimony of Professor Jay Folberg).[19] Donor anonymity was also valued because it ensured that no one other than a wife, her husband, and their doctor knew that the child the woman was bearing was not her husband's biological child. Typically, married couples used a donor's semen because of the husband's infertility. The couples generally did not want the child, or anyone else, for that matter, to know that the husband was not the child's biological father or to later attempt to learn the biological father's identity. Tape Recording, House Committee on Judiciary, HB 3193, May 3, 1977, Tape 44, Side 1 (testimony of Professor Jay Folberg and Dr. Miles Novy); Tape Recording, Senate Committee on Judiciary, HB 3193, June 27, 1977, Tape 50, Side 1 (testimony of Professor Jay Folberg and Dr. Nancy Alexander).[20]

The written and oral testimony from the May 3, 1977, committee hearing in the House confirms that the

---

[18] During testimony on the bill, in response to questions about the health of donors, Alexander explained that the donors are mostly medical students, who are very interested in their health and know their backgrounds quite well. Tape Recording, Senate Committee on Judiciary, HB 3193, June 27, 1977, Tape 50, Side 1 (testimony of Dr. Nancy Alexander). In written testimony, she also explained that the donor screening process was selective, accepting only about 40 percent of the donor applicants, and that matching donor sperm to a specific patient was a medical decision made by OHSU using "phenotypic match of physical characteristics with a suitable donor." Exhibit E, House Committee on Judiciary, HB 3193, May 3, 1977, 1 (testimony of Dr. Nancy Alexander).

[19] Folberg was active in national efforts to encourage states to pass AI legislation. To his knowledge, the only cases that had arisen in the country involved denials of paternity by husbands arguing, in divorce proceedings, that they should not be required to pay support for AI children to whom their wives had given birth. Tape Recording, Senate Committee on Judiciary, HB 3193, June 27, 1977, Tape 50, Side 1 (testimony of Professor Jay Folberg).

[20] The legislators considering this bill were attuned to that concern because of the growing public pressure to open Oregon's adoption records so that adoptees could determine the identity of their genetic parents (which passed by initiative a few years later). *See generally* Tape Recording, House Committee on Judiciary, HB 3193, May 3, 1977, Tape 44, Side 1; Tape Recording, Senate Committee on Judiciary, HB 3193, June 27, 1977, Tape 50, Side 1.

legislature understood that the legislation addressed the
then-existing AI practice of using semen from husbands or
anonymous donors only. Tape Recording, House Committee
on Judiciary, HB 3193, May 3, 1977, Tape 44, Side 1
(exchange between Rep David Frohnmayer and proponents).
Novy's written testimony explained that (1) "inseminations
with semen from an anonymous third party" had become
prevalent and "the demand for *this* procedure" was increas-
ing; and (2) the bill's purpose was to establish the legitimacy
and legal status of children resulting from AI. Exhibit A,
House Committee on Judiciary, HB 3193, May 3, 1977, 1
(testimony of Dr. Miles Novy) (emphasis added).[21]

Folberg and Bechtel's written testimony also
emphasized that the bill proposed "minimal regulations
concerning the practice of artificial insemination." Exhibit
D, House Committee on Judiciary, HB 3193, May 3, 1977,
3 (testimony of Professor Jay Folberg and Betty Bechtel).
Novy further explained that the AID program that he and
Alexander ran at OHSU served "infertile couples," that the
number of "inseminations with semen from an anonymous
third-party donor *** in Oregon are not precisely known,"
and that demand for "the procedure" was increasing as the
number of children available for adoption was declining.
Tape Recording, House Committee on Judiciary, HB 3193,
May 3, 1977, Tape 44, Side 1 (testimony of Dr. Miles Novy).[22]

The legislative history contains only one discussion
about the possibility of a donor who would not be anony-
mous. Tape Recording, House Committee on Judiciary, HB
3193, May 3, 1977, Tape 44, Side 1 (exchange between Rep
Frohnmayer and proponents). That discussion began with
Representative Frohnmayer saying that he was "curious"
why there was no provision in the bill, "pro or con," about

---

[21] Novy's description of AID (artificial insemination by donor) is consistent
with descriptions of the practice in contemporaneous legal and medical sources.

[22] At other points during the hearing, the bill's proponents described the fact
that donors never know if their semen resulted in a pregnancy, that children
produced through AID were produced anonymously, that donors were usually
medical and graduate students who did not remain in the program for long, that
donors were screened and selected by the clinics who provided the semen, and
that records of donors' identities remained confidential. Tape Recording, House
Committee on Judiciary, HB 3193, May 3, 1977, Tape 44, Side 1 (statements of
Professor Jay Folberg, Dr. Miles Novy, and Dr. Nancy Alexander).

whether the donor "would be anonymous." *Id*. He wondered, for example, how a clinic or physician would handle a request by a couple who wanted a brother to be a donor. *Id*. Novy explained that "the overwhelming opinion on the part of the physicians and among the consumers is to preserve the anonymity of the donor." *Id*. He urged that it "would be a mistake * * * to put that into the legislation because in time there might be particular exceptions" that should be settled "on an individual basis." *Id*.

Frohnmayer then asked, "[U]nder the circumstances in which you now administer the program, how many donors or recipients know the identity of the other?" *Id*. Alexander answered with an unqualified "[n]one." *Id*. Novy then urged that, if the public sentiment changed so that donors would not be anonymous, legislation could be introduced to change the practice and that, until that time, it would be better "to go with the practice as it currently exists." *Id*. Folberg then explained that, unlike adoptees, AID-children rarely even know that they were conceived through AID; the child comes home with the mother from the hospital, so "the question" of who is the father does not arise with family, friends, and others. *Id*. Folberg emphasized, as Novy had explained, that the existing practice was that physicians retained donor records; those records could be opened if the practice of keeping them confidential were ever "reconsider[ed]." *Id*. With that, Frohnmayer had no further questions about donor anonymity, and his inquiry shifted to how physicians screened donors for genetics and health.

That exchange can be reduced to this: Representative Frohnmayer expressed concern that anonymity of donors could be a problem if someone wanted a relative to be a donor. The answer was, in effect, "that's not the current AI practice and not what this legislation addresses." *See* Tape Recording, House Committee on Judiciary, HB 3193, May 3, 1977, Tape 44, Side 1 (exchange between Rep Frohnmayer and proponents). The AID practice in place was to use third-party donors and to keep their identity confidential, which everyone involved "overwhelmingly" preferred. *Id*. The legislation was intended to address only the AID practice as

it was being administered in the clinics at the time; those were the only "donors" that the legislature and the bill's terms contemplated. In the future, the clinics would have the latitude to handle requests to use family members or other known donors as "exceptions" and deal with them on an individual case-by-case basis if the practice changed. *Id*. There was no motion to amend the bill or other proposed change that was voted on and rejected by the legislature. Nor was there any proposal to narrow the term "donor" that the legislature rejected. The sponsors and legislators engaged in a normal exchange about the nature of what the bill addressed and determined that the bill, as drafted, was appropriate.

In sum, the committee hearings on the 1977 legislation confirm that the bill was intended to address artificial insemination as it was then practiced by the medical profession—a practice limited to the use of semen provided by husbands and anonymous third-party donors. Thus, the text, context, and legislative history of the donor statute, ORS 109.239 (1977), all confirm that it was not intended to address known or directed donors selected by the intended parents, at all.

The majority opinion concludes that the legislative history demonstrates that the law was always intended to cover known or directed donors as well as anonymous ones. It notes that the written testimony submitted by the bill's proponents indicated that donors "usually"—but not always—remained anonymous; observes that Representative Frohnmayer asked about known donors during the May 3, 1977, legislative hearing; and explains that the statute as enacted was worded broadly enough to cover both anonymous and known semen donors.

It is true that one exhibit submitted by the bill's sponsors stated that donors other than the husband "usually" remained anonymous, but the bulk of the legislative record reveals that the legislation was intended to cover AI as it was practiced in 1977, using only husbands or anonymous donors. Similarly, although ORS 109.239 (1977) used broad wording that could be interpreted to cover known as well as anonymous donors, as the majority opinion notes,

such an interpretation is contrary to the provision in ORS 677.360, which requires the AI doctor to select the donor. The majority opinion's overbroad interpretation is also contrary to the context of how AI was understood and practiced at the time. And, as noted, a close examination of the discussion regarding Frohnmayer's inquiry about known donors does not support the conclusion that the legislature intended for the law to cover known or directed donors selected by the intended parents.

Aside from that single discussion about the possibility of a known or directed donor, overall, the legislative history confirms that the legislature intended ORS 109.239 (1977) to address the then-existing AI practice of using semen from anonymous donors. The proponents explained that donors never knew if their semen had resulted in a pregnancy, that children produced through AID were produced "anonymously," that donors were usually medical and graduate students who did not remain in the program for long, that donors were screened and selected by the clinics who provided the semen, and that records of a donor's identity remained confidential. *See generally* Tape Recording, House Committee on Judiciary, HB 3193, May 3, 1977, Tape 44, Side 1 (statements of proponents).

In short, the overwhelming gist of the legislative history establishes that ORS 109.239 (1977) addressed artificial insemination as it was then practiced by the medical profession—limited to the use of semen provided by husbands and anonymous third-party donors. It was never intended to address known or directed donors. And it certainly was never intended to answer the novel question presented in this case: When two people in a romantic relationship jointly agree to contribute their eggs and sperm to create a child that, at the time, they intended to parent as their own—albeit, with different parental roles, depending on whether the child was a boy or a girl—does each genetic parent have a legally cognizable parental interest in that child?

The majority opinion's conclusion that "neither Schnitzer nor Sause have any 'rights, obligations or interest' with respect to S simply based on their genetic connection

to S," 371 Or at __ (so at 34:1-3), relies entirely on the application of ORS 109.239 (1977) to known or directed donors selected by the intended parents.[23] Because that understanding of the donor statute is mistaken, the majority opinion's conclusion is incorrect.[24]

C.  *Sause has a legally protected parental interest under the Due Process Clause.*

Compounding the majority opinion's misreading of Oregon parentage law is its failure to recognize that a genetic parent's unique opportunity to establish a parental relationship is also protected by the Due Process Clause. In *Lehr v. Robertson*, 463 US 248, 103 S Ct 2985, 77 L Ed 2d 614 (1983), a child's biological father—the appellant in the United States Supreme Court—contended that, under the Due Process Clause, he was entitled to receive notice before the child could be adopted by the man who married the child's mother after the child's birth. The Supreme Court disagreed.

In concluding that the appellant did not have a constitutional right to notice before the child was adopted, the Court discussed the legal significance of the appellant's biological connection to the child as follows:

"The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails

---

[23] As noted above, at the time that Sause contributed her eggs to this ART process, the law in Oregon—as understood by the Court of Appeals in *McIntyre*, 98 Or App 462, in 1989—was that applying the donor statute to deny parentage to a known sperm donor who donated his sperm in reliance on having a parental role violated the sperm donor's rights under the Due Process Clause.

[24] The majority opinion suggests that my reading of Oregon parentage law raises the potential for increasing litigation and uncertainty for known gamete donors. 371 Or at __ n 7 (so at 36 n 7) But whether there is uncertainty leading to litigation is entirely within the control of the parties—the intended parents and the known donor—at the time of the donation. If their mutual intent is that the donor would *not* have any parental interest, the donor can waive any claim to a parental interest. Further legislation addressing developments in ART would reduce any uncertainty that could arise if the intended parents and known donor decline to make their intentions clear at the time of the donation.

to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie."

463 US at 262. The Court then explained that, under New York law, a putative father could marry the mother—thereby giving rise to the marital presumption of paternity—or the putative father could enter his parentage claim in a state registry—an option that the appellant in *Lehr* had not used. Either action would have given the appellant a statutory right to notice. Because of those statutes, the Court concluded, state law "adequately protected [the] appellant's inchoate interest in establishing a relationship" with his daughter. *Id.* at 265. Thus, the Court found "no merit in the claim that [the appellant's] constitutional rights were offended" when the court approved the adoption without giving him notice. *Id.*

What is this unique "opportunity" or "inchoate interest" that a biological father possesses "that no other male possesses[?]" It can only be his genetic connection to the child. That connection gives a genetic parent a unique opportunity to establish a parental relationship with their children. *Lehr* thus recognizes that the opportunity to establish a parental relationship that arises from a genetic link is protected by the Due Process Clause. If it were not protected, there would have been no reason for the *Lehr* court to analyze whether the New York statutes gave sufficient due process to the genetic father's opportunity. In other words, *Lehr* recognized that a man's genetic connection to a child alone did not make him a legal parent in this context,[25] but it did give rise to a legally cognizable interest that is protected by the Due Process Clause, an interest that could be lost if the man failed to "grasp the opportunity" that that connection presented.

The majority opinion concludes that *Lehr* does not apply here because, unlike the biological father in that case, "Sause does not have a viable state law basis for legal parentage," 371 Or at __ (so at 39:13-14), and the Due Process Clause itself does not provide any constitutional limit on a

---

[25] In other contexts—the obligation to pay child support, for example—a man's biological connection to a child is sufficient to impose that parental obligation regardless of whether the man had "grasped the opportunity" to be a parent.

state's determination of parentage.[26] In my view, that conclusion is in error because, as demonstrated above, Sause *does* have a parental interest that is legally significant under Oregon parentage law. Even if she did not, the Due Process Clause limits the extent to which state law can foreclose a genetic parent's claim to legal parentage.

The majority opinion may be correct in concluding that state law ultimately determines the outcome in "the vast majority of cases," 371 Or at __ (quoting *Lehr*, 463 US at 256) (so at 39:22). However, the Due Process Clause independently limits the extent to which state law can foreclose Sause's parental interest.[27] Thus, even if Sause has no state law claim to parentage, the federal constitution precludes the result reached by the majority's opinion. I agree with the trial court and the dissenting opinion in the Court of Appeals that Sause has done nothing to lose the legal protection afforded that interest. *Sause and Schnitzer*, 312 Or App 71, 112, 493 P3d 1071 (2021) (Kamins, J., dissenting).

D.   *The majority opinion's contractual analysis is flawed.*

The majority opinion aims for consistency with the equality principle set out in ORS 109.030 by concluding that *neither* genetic parent has a legally cognizable parental interest in S. But the majority opinion goes on to conclude that Schnitzer's parentage "arises from his surrogacy agreement with the gestational carrier and her husband," 371 Or at __ (so at 34:4-5), and that Sause might have some contractual rights—but not a parental interest—regarding S, to be determined on remand. The majority opinion's analysis is flawed in two respects.

---

[26] The majority opinion also suggests that this case differs from *Lehr* "because the child in *Lehr* was conceived through intercourse and not through ART or AI." 371 Or at __ n 8 (so at 40 n 8). The majority opinion does not explain why the Due Process Clause would give greater parental recognition to persons who might casually (or accidentally) create a child through sexual intercourse than to persons who collaborate deliberately to create a child through ART or AI.

[27] Commentators agree that there are federal constitutional limits on state law determinations of parentage. *See* Michael J. Higdon, *Constitutional Parenthood*, 103 Iowa L Rev 1483, 1489 (2018) (noting that, "[a]lthough the Court has not said much on the issue of parental identity, what it has said reveals that there are indeed constitutional limits on who can be excluded from the definition of parent"); Jeffrey A. Parness, *Federal Constitutional Childcare Parents*, 90 St John's L Rev 965, 972-76 (2016) (summarizing case law).

First, under Oregon parentage law, no person can "contract into" legally cognizable parental rights without going through adoption procedures. Contracts in this context can *terminate* parental rights arising from other presumptions of parentage, but they cannot *create* parental rights on their own. Second, if Oregon law does allow a person to "contract into" legally cognizable parental rights—a proposition that, in my view, is incorrect—then the equality principle means that Sause should be allowed to establish on remand that she "contracted into" those rights, just as Schnitzer did.

The majority opinion cites five Court of Appeals' decisions in support of its conclusion that Oregon law allowed Schnitzer to "contract into" a legally cognizable parental right without going through the statutory adoption procedures. *See* 371 Or at __ (citing *McIntyre v. Crouch*, 98 Or App 462, 780 P2d 239 (1989); *Leckie and Voorhies*, 128 Or App 289, 875 P2d 521 (1994); *In re Adoption of Baby A and Baby B*, 128 Or App 450, 877 P2d 107 (1994); *Weaver v. Guinn*, 176 Or App 383, 31 P3d 1119 (2001); *Dahl and Angle*, 222 Or App 572, 194 P3d 834 (2008), *rev den*, 346 Or 65 (2009)) (so at 34:16 - 35:7). None of those cases held that Oregon law allows a person to "contract into" parental rights without going through adoption proceedings.

The parental rights at issue in *In re Adoption of Baby A and Baby B* were established through adoption; the court held that a surrogacy contract did not *preclude* the adoption. 128 Or App at 452. In *Weaver*, 176 Or App 383, the court held that custody of the child was properly awarded to the birth mother and refused to enforce an AI agreement that would have given custody to the biological father because he had impregnated the mother through sexual intercourse, not AI. In *Leckie*, 128 Or App 289, the court held that a sperm donor *waived* his parental rights by contract. In *Dahl*, 222 Or App at 585, the court held that an agreement giving a woman custody and control of embryos gave her the right to destroy the embryos despite her husband's objection; parentage was not at issue.

Finally, as noted above, *McIntyre* was decided by a divided court, with no majority opinion. Two of the judges

thought that, if ORS 109.239 (1977) precluded a known sperm donor from having any parental interest, it would violate the donor's rights under the Due Process Clause. *McIntyre*, 98 Or App at 470 (Newman, J., lead opinion); *id.* at 472 (Deits, J., specially concurring). The lead opinion concluded, "We hold that ORS 109.239, as applied to [the sperm donor] petitioner, will violate the Due Process Clause of the Fourteenth Amendment *if* he can establish that he and respondent agreed that he should have the rights and responsibilities of fatherhood and in reliance thereon he donated his semen." *Id.* at 470 (Newman, J., lead opinion) (emphasis in original).

Thus, no Oregon court—before today's majority opinion—has ever held that Oregon law allows a person to "contract into" parental rights without going through adoption procedures. Neither does any Oregon statute authorize "contracting into" legal parentage.[28] At most, Oregon statutes provide that a court will *consider* any contracts the parents have executed when determining parental rights, such as the right to custody of, or parenting time with, a child. But even there, the ultimate decision is made by the court based on its determination of what is in the child's best interests—not the terms of a contract or what the parties to a contract may have intended. *See* ORS 109.175(1) (court "shall give primary consideration to the best interests and welfare of the child" in determining custody after parentage is established); ORS 107.102(5)(b) (in developing a parenting plan, "the court may consider only the best interests of the child and the safety of the parties"). The majority opinion

---

[28] The majority opinion criticizes my statement that, under Oregon parentage law, a contract can terminate parental rights but cannot create parental rights, as being offered "without citation to case law or statute." __ Or at __ n 11 (slip op at 46 n 11). But as noted above, in *In re Adoption of Baby A and Baby B*, the Court of Appeals held that the birth mother gave up her parental rights by contract—a consent to the child's adoption by the intended parents. 128 Or App at 452. And the party claiming a legal right to "contract into" parental rights—Schnitzer in this case—has the burden of establishing that the law supports his claim. Schnitzer cites no statute or case holding that he had a legal right to "contract into" sole parentage. Other than those five inapplicable Court of Appeals' decisions, the majority opinion cites no authority for its conclusion, noting instead that "Schnitzer's parentage is not at issue in this case." __ Or at __ (slip op at 45:22 - 46:1). But Schnitzer's parentage is relevant here because, at least genetically, he is in the same position as Sause, making the equality principle in Oregon parentage law germane to Sause's parentage claim.

offers no reason why a contract should control the predicate question of parental status, when it merely informs a court's determination of parental rights and responsibilities. As an independent source of parentage, contract law is an awkward fit.

If Schnitzer's genetic link to S did not give rise to any legally cognizable parental interest, but he could just "contract into" parental rights by executing a contract with the gestational surrogate and her husband (without going through adoption), then Schnitzer could also "contract into" parental rights by executing a contract with any pregnant woman and her spouse. That is not, and has never been, the law in Oregon, and the majority opinion offers no persuasive reason why it should be the law. Nor does it provide any limiting principle that would allow Schnitzer to "contract into" parental rights under the circumstances presented here but would prevent him or any other person from "contracting into" parental rights under different circumstances. The novel facts of this extraordinary case do not merit such an upheaval of Oregon's approach to parentage.

Finally, even if the majority opinion is correct that Schnitzer has a legally cognizable parental interest in S based solely on his contract with the gestational surrogate and her husband, not on his genetic link to the child, then Sause should have that same opportunity. By denying her the same opportunity that Schnitzer had, the majority opinion violates the equality principle set out in ORS 109.030.

## II.   CONCLUSION

The genetic link between Sause and S gave her a legally significant parental interest, just as the genetic link between Schnitzer and S gave him a legally significant parental interest. That interest is protected under Oregon parentage law and by the Due Process Clause of the United States Constitution. The trial court determined, correctly in my view, that Sause's interest was not overcome by any contrary provision of law, the parties' agreement, or other evidence in this case.

The majority opinion errs by (1) failing to recognize that both Sause and Schnitzer have legally significant

parental interests in S arising from their undisputed genetic link to the child; (2) determining, for the first time in Oregon, that a person can "contract into" a legally cognizable parental interest without going through adoption; (3) determining in this case that Schnitzer has "contracted into" parentage and remanding the case to determine whether Sause has contractual—but not parental—rights regarding S, thereby denying Sause the opportunity to "contract into" parental rights as Schnitzer did; and (4) interpreting the donor statute, ORS 109.239 (1977), to preclude both Sause and Schnitzer from having any legally cognizable parental interest based on their genetic connection to S.

For those reasons, I respectfully dissent.

Flynn, C.J., and Linder, S.J., join in this dissenting opinion.

**LINDER, S.J.,** dissenting.

I join Justice Bushong's dissent. I agree with his analysis that, under state law, Sause is entitled to a judicial declaration that she is S's parent, along with Schnitzer. This case should end with that state law answer. But the majority resolves that issue differently, holding that state law provides no basis for Sause to be recognized as S's legal parent. The majority therefore reaches and resolves the federal law question of whether S has a parental interest protected under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, concluding that she does not. Justice Bushong addresses why the majority's federal law analysis is wrong, and I agree with him. I write separately, however, to further explain why, under the federal constitution, Sause should prevail.

My central premise is this: When two people bring a child into the world by combining their genetic material using assisted reproduction technology (ART), and they do so with the intent that both will have parental roles in the child's life, each has a protected parental interest under the Due Process Clause. That conclusion follows regardless of how they agree between themselves to divide and structure their parental roles. For purposes of due process, what matters is whether, as the child's genetic and intended parents,

each has demonstrated the commitment, consistent with the opportunities available to them, to have a parent-child relationship with their genetic offspring.

The United States Supreme Court's jurisprudence on due process protection for personal liberties involving reproduction and family relationships, including parent-child relationships, is vast. Canvassing that jurisprudence, however, is not necessary for this case. The issue here is narrower: It is not what rights Sause has as a parent; it is whether, for constitutional purposes, Sause is entitled to legal parental status at all. Few Supreme Court precedents guide that inquiry. What few there are culminated in the Court's 1983 decision in *Lehr v. Robertson*, 463 US 248, 256, 103 S Ct 2985, 77 L Ed 2d 614 (1983). The Court has not provided authoritative guidance on the issue since. *Lehr* thus is the Supreme Court's principal holding on whether and when a state violates a genetic parent's constitutionally protected interests by declining to recognize that individual as a child's legal parent.[1]

As to what guidance *Lehr* provides, Justice Bushong observes that *Lehr* recognizes an "opportunity" or "inchoate interest" that is itself subject to due process protection; if a genetic parent adequately "grasps" that opportunity by taking "some measure of responsibility for the child," then a constitutionally protected parent-child relationship arises. 371 Or at ___ (Bushong, J., dissenting) (quoting and discussing *Lehr*'s holding) (so at 28:2 - 31:5). That understanding of *Lehr* accords with the views of countless courts and legal commentators. One commentator, for example, explains:

"As an initial point, the Court [in *Lehr*] made clear that biological parentage is not dispositive, ruling that 'the mere existence of a biological link does not merit equivalent constitutional protection.' Instead, the Court put forth what is commonly referred to today as the 'biology plus' doctrine. According to the Court, 'when an unwed father demonstrates a full commitment to the responsibilities of parenthood by

---

[1] *See generally* Anthony Miller, *The Case for the Genetic Parent:* Stanley, Quillion, Caban, Lehr, *and* Michael H. *Revisited*, 53 Loy L Rev 395 (2007) (tracing the evolution of the Supreme Court's jurisprudence on due process protection for the interests and rights of genetic parents; discussing *Lehr*'s significance as the last decision providing authoritative guidance for the analysis).

"coming forward to participate in the rearing of his child," his interest in personal contact with his child acquires substantial protection under the Due Process Clause.' In other words, biological parenthood provides a nonmarital father with an incipient right, one that will not fully develop until he takes sufficient steps to foster a parental relationship with the child. Accordingly, the Court upheld the New York law given that it 'had adequately protected his opportunity to form such a relationship.' In the Court's view, the fact that Lehr never seized that opportunity was nobody's fault but his own. Michael J. Higdon, *Constitutional Parenthood*, 103 Iowa L Rev 1483, 1499 (2018) (footnotes and brackets omitted).[2]

*Lehr* thus frames the questions: What opportunity did the state provide Sause to foster a parent-child relationship with S? And did she sufficiently grasp it?

Under the majority's analysis of Oregon's statutes, state law provided Sause with no opportunity to develop a parent-child relationship with S. Sause was not the birth mother, so she had no presumptive parental status. Schnitzer broke off communications with Sause and prevented her from having any contact with S after the day he was born. Shortly after, Schnitzer filed for and swiftly obtained a declaratory judgment designating him S's "sole genetic" and "legal parent." Sause was not named in Schnitzer's petition for that judgment; she was not given notice of the petition; and the petition did not identify her participation in S's conception. When Sause later learned of the judgment and moved to

---

[2] Courts and other scholars taking the same view are too numerous for citation. But representative cases spanning the decades since *Lehr* was decided include: *Matter of Doe*, 170 Idaho 901, 911, 517 P3d 830, 840 (2022) (protected parental rights arise under *Lehr* based on established relationship between genetic parent and child, while protected "inchoate" interest arises in opportunity to develop that relationship); *Thurnwald v. A.E.*, 2007 UT 38, 163 P3d 623, 635 (Utah 2007) (under federal due process, state adoption procedures must give unwed genetic father opportunity to establish a relationship with child); *In re M.N.M.*, 605 A2d 921, 927 (DC 1992), *cert den*, 506 US 1014 (1992) (*Lehr* recognizes opportunity interest in genetic parent to develop a relationship with his offspring, one that requires state procedural protection); *In Re Steve B.D.*, 112 Idaho 22, 25, 730 P2d 942, 945 (1986) (under *Lehr*, state owes due process and equal protection to the parental rights of unwed fathers who have established relationships with their children, and also owes them the opportunity to establish such relations).

intervene to assert her parental interest, her motion was denied. Sause therefore pursued the only state procedural avenue available to her to obtain legal parent status: She filed this declaratory judgment action. But under the majority's holding in this case, that avenue is a dead end—nothing in Oregon law gives Sause, as S's undisputed genetic parent, any opportunity to foster and form a relationship with S. For Sause, the state procedural door of opportunity closed and locked without ever opening.

That result violates Sause's protected due process interests under *Lehr*. What *Lehr* requires in terms of a sufficient "grasping" of the opportunity to develop a parent-child relationship must be viewed through the lens of the factual circumstances of each case. Unlike the putative father in *Lehr*, *see* 463 US at 250-54 (describing facts), Sause had no post-birth opportunity for a parental relationship with S, because Schnitzer would not allow her to have any contact with S. As one legal commentator observes, the protected opportunity interest that *Lehr* identified is violated when— either practically or legally—it is cut off before it can arise:

"[Under *Lehr*, the] genetic parent who has established a relationship with his or her child should be considered a parent for constitutional purposes. [And], the genetic parent should be treated as a parent, even when this parent has not had the opportunity to develop a relationship with the child, in two distinct situations: first, where the parent has been prevented through no fault of his or her own from establishing a relationship; and second, where new parents utilize cutting edge reproductive technology and the state has moved to sever the parent-child relationship before the opportunity to develop such a relationship has arisen."

Anthony Miller, *The Case for the Genetic Parent:* Stanley, Quilloin, Caban, Lehr, *and* Michael H. *Revisited*, 53 Loy L Rev 395, 450 (2007). Here, it is not the state *qua* state "moving" to sever Sause's opportunity. The majority achieves that severance via its judgment in this case. But that is state action just the same.[3]

---

[3] This is a dispute between private parties whose arguments reflect their self-interests. The state is not a party in an *amicus* capacity or otherwise; the Oregon Attorney General is not before this court urging that a state interest is

As the quote above suggests, *Lehr* frames a second question as well: Despite the lack of state legal protection for Sause's "opportunity interest" in developing a parent-child relationship with S, did Sause nevertheless achieve that relationship in fact? If she did, she is entitled to parental status under the federal constitution.

Answering that question requires context. In this case, the important context is the parties' collaborative ART conception. Before a child's birth, a parent cannot develop a relationship with the child in the sense that *Lehr* expected of the unwed father in that case, whose child was about two years old when the parties' dispute arose. *See* 463 US at 250-54 (describing facts). But before a child's birth, a parent can demonstrate a *commitment* to that parent-child relationship. For a collaborative ART conception, which in this case entailed a deliberative process by which one genetic parent combined gametes with another to bring a child into the world through gestational surrogacy, the parents' pre-birth commitment should carry constitutional weight.

Sause's commitment to a parent-child relationship with her offspring arose well before S was conceived. Specifically, her commitment began with her decision to have her eggs retrieved and preserved for her own reproductive use, not that of an anonymous recipient whom she would never know and who would never know her. From the outset, Sause made the decision to use ART to have her eggs medically retrieved to preserve her future ability to have genetic offspring and be a mother.

Her motivation shifted—but only partly—when she and Schnitzer, with whom she had begun an intimate relationship, began to discuss conceiving children together. Sause urged that it was in a child's interest to know the child's genetic mother, something that would not happen if Schnitzer had a child using anonymously donated eggs. If Sause and Schnitzer instead were to combine her eggs and his sperm, the child could know Sause as his mother and have contact with her. Schnitzer, however, wanted only a boy, and he wanted sole legal custody of him. Sause understood

served by foreclosing Sause from legal parental status under the circumstances of this case.

Schnitzer's reasons for those limitations, and she could accept and support Schnitzer in them. It was important to her, however, that if her eggs were used, the boy would know her as his mother and she would be active in the boy's life.

Schnitzer and Sause struck a mutually beneficial agreement: Schnitzer would have custody of any viable male embryos, which he would attempt to bring to term through a gestational surrogacy that he would arrange. Sause would have custody of any viable female embryos, which she would have frozen for her future reproductive use. If the gestational surrogacy succeeded, Schnitzer would have full legal custody of the boy. Sause would be the boy's acknowledged mother and have contact with him. She would have, in effect, the kind of noncustodial role that parents may privately agree to without forfeiting their legal parental status and that Oregon courts routinely order for divorcing or unwed parents who either do not want or cannot agree to joint custody. *See* ORS 107.169(3) (court may not order joint custody unless both parents agree to terms and conditions of order).

With their mutual intent and understanding in place, Sause followed through with having her eggs retrieved.[4] She then consented to having them fertilized with Schnitzer's donated semen. For the three viable

---

[4] The lead opinion in the Court of Appeals described the trial court as having found, factually, that Sause chose to have her eggs retrieved for her own purposes, not for purposes of sharing them with Schnitzer. *Sause and Schnitzer*, 312 Or App 71, 103, 493 P3d 1071 (2021). That description failed to appreciate that the trial court's finding related only to Sause's initial decision, not her state of mind later when she underwent the medical procedure for retrieval of her eggs. In particular, the trial court found that early in Sause and Schnitzer's intimate relationship, Sause decided to have her eggs retrieved for her own reproductive purposes. The trial court further found, however, that Sause and Schnitzer soon began discussing the possibility of combining their reproductive efforts. The trial court specifically credited Sause's testimony about those discussions, including that both Sause and Schnitzer considered it a "win-win" to combine her eggs and Schnitzer's sperm, and then to divide any viable embryos between them based on sex. They further agreed that, although Schnitzer would have sole legal custody of any male child, the child would know Sause as his mother and she would be involved in his life. Sause did not undergo the procedure to have her eggs retrieved until much later. By that time, Sause and Schnitzer had engaged in those discussions, had decided to combine their gametes, had worked with the Oregon Health and Science University (OHSU) fertility clinic on that basis, and—as the trial court found—had formed the mutual intent that Sause have a parental role in the life of any son that their collaboration might bring into the world.

embryos that resulted, Sause agreed to have them tested to determine their sex. The embryos remained in her full and unilateral custody throughout that time. Once the testing revealed that all three viable embryos were male, Sause transferred custody of them to Schnitzer.[5] She did not do so with the understanding that she would have no parental relationship with any child the gestational surrogate might carry to term. Just the opposite: Sause and Schnitzer's mutual intent remained that Sause would be the child's acknowledged mother and she would have a maternal (albeit a noncustodial) role in his life. Months later, one of the viable embryos was successfully implanted in the gestational surrogate. Sause remained committed to having a maternal relationship with the yet-to-be-born boy; Schnitzer remained committed to that too. Even after Sause's interest in possibly marrying Schnitzer changed and their intimacy cooled, they remained on good terms, and their mutual intent for Sause to have a parent-child relationship with S did not waver. When the two of them had their irreparable falling out on the day that S was born, Schnitzer's intent changed, but Sause's did not. As the trial court pointedly found, "at that moment, and not before," Schnitzer decided to cut Sause out of S's life.

In her dissent in the Court of Appeals, Judge Kamins recounted in detail the interactions between Schnitzer and Sause (and Sause's family) throughout the 16 months of their intimate relationship and beyond, up to the day of S's birth. *Sause and Schnitzer*, 312 Or App 71, 112-14, 493 P3d 1071 (2021) (Kamins, J., dissenting). Those details further demonstrate not just the fact of Sause's commitment to a parent-child relationship with S, but also the depth of

---

[5] Contrary to the majority's suggestion, ___ Or at ___ (slip op at 3:14-17), OHSU did not have Sause sign a "standard" egg donor form. Nudelman, Schnitzer's business lawyer, obtained that form and had Sause sign it before she began working with OHSU for her egg retrieval. Until this litigation, OHSU was not aware that Sause had signed that form. Dr. Battaglia, the physician who oversaw the collaborative ART process for Schnitzer and Sause, explained that the standard form did not fit what they wanted to accomplish. Instead, OHSU had both parties sign other consents and directives, ones by which custody and control of the retrieved eggs remained with Sause until it was time, well after her eggs were retrieved, for her to give Schnitzer custody of the viable male embryos if she remained willing to do so. As Battaglia's undisputed testimony established, Sause was never an egg donor.

her commitment. That commitment, along with Sause's collaboration in S's conception and the parties' mutual intent that Sause have a parental role, is sufficient to satisfy *Lehr* where, as here, Sause had neither a practical nor a legal opportunity to foster a parent-child relationship with S after S's birth.[6]

What animates the majority's analysis may be the same concern that Judge Kamins identified as possibly animating the Court of Appeals majority: that Sause was not committed to a full-*enough* role as a parent to be entitled to constitutional protection. *Sause*, 312 Or App at 114-15. That is suggested by, among other statements in the majority opinion, that Sause intended Schnitzer to have sole legal custody while retaining for herself only the "hope" of contact with the child and of some "undefined quasi-parenthood" role. 371 Or at \_\_\_ (so at 38:14). To borrow from Judge Kamins's apt observation:

"As the *Lehr* Court recognized, 'the intangible fibers that connect parent and child have infinite variety.' 463 US at 256. That variety has only multiplied as parents have woven those fibers in ever-increasing family arrangements in the

---

[6] The majority all but summarily rejects Sause's federal claim. The majority reasons that, under the donor statute (ORS 109.239 (1977)), Oregon does not recognize Sause as S's legal parent; therefore, federal law gives her no protection. 371 Or at 371, \_\_\_ (so at 28 n 5, 39:11-12). I agree with Justice Bushong that the majority has not interpreted the statute consistently with the legislature's intent. \_\_\_ Or at \_\_\_ (Bushong, J., dissenting) (slip op at 13:22 - 28:1). But even if the donor statute applies, that conclusion frames the federal issue rather than resolves it. As other courts have recognized, the federal issue then is whether the donor statute is unconstitutional as applied. Although lower courts have come to differing results on the facts before them, none reason that the federal issue evaporates with a conclusion that state law categorically renders gamete donors legal strangers to their own genetic children. *See, e.g., C.O. v. W.S.*, 64 Ohio Misc 2d 9, 10-12, 639 NE 2d 523, 524-25 (Ohio Ct CP 1994) (assuming *arguendo* that state donor statute extinguished semen donor's parental interests, statute was unconstitutional as applied where donor was known to recipient, recipient solicited donor to provide semen, and recipient agreed donor could have contact with the child and be a "male role model" for the child); *In re Interest of R.C.*, 775 P2d 27, 35 (Colo 1989) (avoiding constitutional issue by construing donor statute not to apply when semen donor is known to unmarried recipient and the two expressly agree at time of conception that donor will be treated as child's father); *see also In re K.M.H.*, 285 Kan 53, 169 P3d 1025, 1040-42 (2007), *cert den*, 555 US 937 (2008) (donor statute did not unconstitutionally deny parental status to semen donor who orally agreed with recipient that he would have parental role in resulting twins' lives where statute gave donor the option to enter written agreement to preserve parental status and donor failed to exercise that option).

forty years since *Lehr* was decided. Whether the way some-one chooses to make a family creates a constitutional right cannot be as simple as whether someone intends to be a full-time parent or not a parent at all." *Sause*, 312 Or App at 115 (Kamins, J., dissenting) (brackets omitted).

To that observation, I add this: Sause's choice to agree that Schnitzer would be S's sole legal custodial parent did not amount to her shirking parental responsibility or disregarding S's best interests. Schnitzer was insistent that he have sole legal custody, for reasons that Sause understood and, apparently, was sympathetic to. Sause knew Schnitzer to be a mature, experienced, loving father of his two daughters. Sause likewise knew that Schnitzer, due to his wealth, was easily able to support S financially and meet his every need. In persuading Schnitzer that she should have a *parental*, even if noncustodial, role in S's life, Sause did so not just to ensure that she would have a parent-child relationship with her own offspring; she also believed it was in S's best interest to know and have contact with his genetic (and only) mother. Finally, with her expectation and desire to be on S's birth certificate, Sause intended to be *legally recognized* as S's mother. Her desire for that legal parental status necessarily amounted to a full commitment to S's care and support, because no matter how a child's legal parents may privately allocate their parental rights and responsibilities between themselves, it remains within an Oregon court's jurisdiction and authority to depart from their agreement if doing so will be in the child's best interests.

In sum, in the context of this collaborative ART conception case, Sause's genetic parental link to S, together with her consistent pre-birth commitment to a parental relationship with S, gives rise to parental status under the federal constitution. Nothing in Sause's conduct in this case or the terms on which she and Schnitzer agreed to bring S into the world should divest her, as S's genetic and intended parent, of the fundamental parent-child relationship that the Due Process Clause so jealously protects.

Respectfully, I dissent.

Bushong, J., joins in this dissenting opinion.